Docket No. 88833–Agenda 13–September 2000.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EDWIN ORTIZ, Appellant.

Opinion filed May 24, 2001.

JUSTICE FREEMAN delivered the opinion of the court:

Following a bench trial in the circuit court of Bureau County, defendant Edwin Ortiz was convicted of drug trafficking (720 ILCS 570/401.1 (West 1994)) and sentenced to 35 years’ imprisonment. Defendant appealed, and in December 1995 the appellate court filed with its court clerk a document which purported to reverse defendant’s conviction on the grounds of insufficiency of the evidence. The State’s petition for rehearing was denied, and we denied leave to appeal in June 1996. Subsequently, in August 1997, the State moved for a writ of 
mandamus
 or a supervisory order, directing the appellate court to vacate its December 1995 order and issue a “valid opinion.” We issued a supervisory order to that effect, and denied defendant’s motion for reconsideration. Defendant’s subsequent petition for a writ of 
certiorari
 in the United States Supreme Court was also denied. In January 1999, the appellate court issued a document in the form of an opinion to be published, which denied defendant’s motion to have that court declare its December 1995 filing a final order. In December 1999, the appellate court affirmed defendant’s conviction. No. 3–95–0261 (unpublished order under Supreme Court Rule 23).

We thereafter granted defendant’s petition for leave to appeal (155 Ill. 2d R. 315) from the appellate court’s December 1999 order affirming his conviction. For the reasons that follow, we reverse.

BACKGROUND

Defendant’s conviction arose out of the events of December 9, 1994. On that date, pursuant to a consensual search after a traffic stop, police discovered 100 kilograms of cocaine inside a secret compartment in the truck tractor semi-trailer which defendant was driving.

At defendant’s trial, the following evidence was adduced during the State’s case in chief. The State’s first witness was Illinois State Trooper John Balma, who testified as follows. On December 9, 1994, Balma observed a blue tractor trailer traveling eastbound on Illinois Route 80. The vehicle was moving at a speed of 63 miles per hour, which was 8 miles per hour in excess of the posted speed limit. Balma stopped the truck to issue a traffic citation.

Defendant was driving the truck, and there was a female passenger in the cab with him. Upon Balma’s request, defendant produced his license and registrations. Balma testified that defendant produced his driver’s license from his pocket; he did not remember where the registrations had been kept. Defendant’s New Jersey driver’s license was valid and the registrations for the tractor and the trailer matched the VIN numbers for the vehicles. The vehicles were registered to a Danny Estrella, which Balma confirmed by radio. Balma testified that even though this paperwork was in order, defendant seemed “extremely nervous,” more so than was in his experience ordinary for a traffic stop.

Defendant told Balma that he was hauling oranges from Fillmore, California, to New Jersey, and produced a bill of lading. The bill of lading indicated that the truck contained 630 cases of oranges, which were owned by Star Produce. “Star Produce” was written on the side of the truck, as well.

Balma requested defendant’s log books, in which were kept the records of every stop made by the truck. The books indicated that defendant’s trip had actually begun in Tennessee, not California. When Balma asked defendant why he had begun driving in Tennessee, defendant told him that he and a codriver, Juan Colon, had driven together from New Jersey to California; Colon had driven from New Jersey to Tennessee and defendant began driving in Tennessee. Balma also determined from the log books that this was the second cross-country trip defendant had made in the recent past, and on the other trip Colon was with him the entire way as a codriver. Defendant told Balma he was paid $900 to $1,000 for each trip, even though he had a codriver on the previous trip.

Balma testified that this was an abnormal pay arrangement. Balma had been a truck driver for approximately 15 years before becoming a law enforcement officer. Based on his prior experience, he believed driving pay was based either on mileage or an hourly rate, but in either event the total amount of money was split between the drivers if there was more than one. For a driver to receive the same pay regardless of whether he had a codriver was “very unusual.” However, Balma admitted that time was sometimes of the essence in delivery and that a truck would be able to make better time more safely with two drivers sleeping in shifts than with a single driver.

Balma further noted from his review of the log books that after defendant and Colon had driven to California they had stayed there approximately a week before beginning the return trip to New Jersey. When he asked defendant why he had been there so long, defendant stated that he was “waiting for them to pick their oranges.” When Balma asked if his trailer was full, defendant stated that it was only half-full, which Balma also found very unusual, because it was not cost-effective to transport half-loads of products across the country. Balma stated that defendant said that Colon had loaded first and filled his trailer, and defendant just took what was left of the load. Balma admitted that during his years in the industry he had sometimes thought that an employer was not making the best use of his truck or his time, but he still did what his employer asked because that was what he was being paid for.

When Balma asked about the female passenger in the vehicle defendant said that she was his wife. He said that she had not driven out with him to California from New Jersey. Balma testified that defendant told him that the truck owner, Estrella, had flown her out from New Jersey to California to be with him. At this point Balma observed that defendant “was becoming extremely nervous.” Defendant was “constantly rubbing his hair,” tapping his foot, and “wiggling” his leg. Balma admitted that he did not know defendant and had no idea of his general demeanor.

Balma inspected the truck and issued defendant a written warning. Shortly before Balma gave defendant the warning, defendant volunteered that it had been “a bad trip, he got stuck in California. He was searched three times in Utah. And now this.” After giving defendant the warning and returning his documents, Balma advised him that he was free to go. However, Balma then asked defendant if he had anything illegal in his vehicle. Balma testified that defendant turned his head away and replied, “No, do you want to look?” Balma told defendant that he would like to, and produced a voluntary consent form, which defendant signed.

Balma called for backup and Troopers Kathy Miroux and Michael Ketter responded. Defendant retrieved a key for a padlock on the trailer portion of the truck and opened it. Balma proceeded to search the truck while defendant sat in Balma’s patrol car in the custody of the other troopers.

The truck was approximately half-full of boxes, which were labeled as containing oranges. The entire load was towards the front half of the trailer. Balma climbed on top of the boxes and crawled approximately 20 to 25 feet over the top of them to the front of the trailer. When he shone his flashlight down he saw a sheet of aluminum “diamond plate” affixed to the front wall of the trailer which appeared to be fairly new. He testified that it was obvious as soon as he saw it that the plate was not part of the original makeup of the trailer, but admitted that the plate was not visible from the rear of the truck.

When Balma shone his flashlight between the plate and the front wall of the trailer he saw a yellow wrapped package. Further observation revealed that there was more than one package. He punctured one of the packages and the material inside appeared to be cocaine. Balma exited the vehicle and placed defendant under arrest, telling him that there was cocaine in the vehicle. According to Balma, defendant “just basically submitted to the arrest. He didn’t ask why or where or who or anything. He just showed very little emotion.”

Balma testified that after arresting defendant he seized $561 from defendant’s person. Balma also identified two pagers which were found on the visor above the driver’s seat in the cab of the truck. He stayed with the truck while it was towed to a location where the oranges could be unloaded and then watched as the plate at the front of the truck was removed. Behind the plate were 61 packages of cocaine, containing what was stipulated to be 100 kilograms of 76.9% pure cocaine, with an estimated street value of $30,760,000.

Trooper Balma also testified over objection that on September 28, 1994, he had arrested two men, Pedro Then and Orlando Fernandez, when he found 67 kilograms of 88.1% pure cocaine in a Ryder truck in which they were traveling eastbound on I-80.

Balma admitted on cross-examination that when he was a driver he had hooked his tractor to preloaded trailers without observing the loading process. He stated that although he would look inside the trailer before leaving, the inspection was limited to making sure that the load was secure. If things appeared to be loaded correctly he did nothing further. He also testified that at some point during the stop, defendant had told him that Colon was in another truck and was also hauling oranges and was somewhere behind him.

Illinois State Trooper Kathy Miroux verified Balma’s testimony that after she and Trooper Ketter arrived on the scene they took custody of defendant while Balma entered the trailer and conducted the search. She testified that defendant looked very nervous while Balma was in the truck and that he mostly watched the rear of the truck during the six- or seven-minute search.

The State next called Ottawa Police Officer John Malone, who was assigned to the District 17 State Police Drug Task Force at the time of defendant’s arrest. He interviewed defendant after his arrest. Defendant was advised of his constitutional rights and waived them. Malone testified that defendant was very calm during the interview. He told Malone that all he knew was that he was hauling oranges from the west coast. He stated that when he picked up his load at the Sunkist Corporation in Fillmore, California, the trailer was already loaded. He merely hooked up the tractor and headed out.

Defendant told Malone that Danny Estrella owned the tractor trailer he was driving. He had met Estrella only once, at a restaurant in New York. Juan Colon, a codriver and a friend of his, had introduced them, and defendant had agreed to drive for Estrella. Defendant told Malone that Colon was also driving a tractor-trailer containing oranges to New Jersey, but the last time defendant had seen him was near the Iowa border, because Colon’s truck had broken down.

Malone testified that he found a photograph in the cab of defendant’s truck. The photograph showed defendant and Colon standing in front of two trucks. Colon had what appeared to be a large gun tucked into the waistband of his pants. Malone also found several truck parking receipts from Ship-side Service, Inc., in Elizabeth, New Jersey. Each one listed the name of the driver who had picked up a truck on a particular date. The most recent receipt, dated November 24, 1994, listed defendant as the driver. An earlier receipt listed Colon, while two others listed the driver simply as “Pedro” and another receipt was issued to “Danny.” Malone testified that the receipts had been found in the cab of the truck defendant was driving, but he did not know where specifically, whether on the floor of the cab or among defendant’s belongings. He admitted that it would make sense that whoever had picked up the truck would simply drop the receipt in the cab.

Additionally, Malone found a bill from a New Jersey truck stop in the name of Orlando Fernandez in a blue binder or folder holding the registrations for the tractor and trailer in the cab of the truck defendant was driving. Malone admitted that it would make sense that the folder belonged with the truck, rather than defendant, since the registration had to be kept with the vehicle.

Malone was also permitted to testify that he had found a receipt for a repair bill signed by Pedro Then among Colon’s belongings in the truck Colon was driving when he was arrested later that day.

Malone admitted that defendant answered all of the questions which were posed to him. However, when Malone asked defendant to “cooperate with [the police] in terms of bringing the truck to New Jersey and following through,” defendant refused, telling Malone that Colon got the job for him. Malone understood defendant to be saying that Colon knew Estrella better than defendant did.

Illinois State Trooper Larry Thomas made a traffic stop of Colon later that day. After a consensual search of his truck, police discovered 285 kilograms of 88.4% pure cocaine, a shipment with a street value of over $100 million. Thomas testified that he had been specifically advised to look for the trailer Colon was driving as a result of Malone’s interrogation of defendant.

At the conclusion of the State’s case in chief, the defense moved for a directed verdict, which the circuit court denied. The judge stated that

“[t]he main thing is the inference that arises from narcotics being found in the premises or in this case a truck within the control of the defendant. Gives rise to a presumption of knowledge that’s not overcome unless there are other facts and circumstances which might lead to reasonable doubt as to the guilt in the minds of the jury. And I’m citing 
People v. Bell
, 53 Ill. 2d 122.”

Defendant testified on his own behalf. Defendant was a resident of New Jersey. Of all the names the State had mentioned during its case in chief, the only person he knew was Colon, with whom he had been good friends for about 20 years. Before his arrest he had never heard of Pedro Then or Orlando Fernandez, and the only time he had met Estrella was in early November 1994. Defendant was having engine trouble with his own truck, and Colon introduced him to Estrella at a restaurant. On cross-examination defendant maintained that he did not know Colon’s address, beyond the town in which he lived. Until two or three months before his arrest, he had never visited Colon’s home during the 20 years that they had been friends.

Defendant only made two trips for Estrella. The first time he flew out to California with Colon in early November and they drove a single truck back together. The second time was the trip on which he was stopped.

On this later trip, defendant and Colon had driven a truck from New Jersey to California together. When they arrived in California, they had to wait four or five days before starting back because they had to wait for the oranges to be picked. While there, defendant called Estrella to ask if his girlfriend could fly out to join him. She flew out and stayed with him for the last two days he was there, in a different hotel, for which defendant paid.

Defendant and Colon drove back to New Jersey in separate trucks. Colon’s truck was loaded before his, and defendant was not even present when Colon’s truck was loaded. Nor did defendant participate in or observe the subsequent loading of his truck. He merely looked in the truck after it had been loaded to determine whether the oranges were stable and he saw that they were.

When Colon’s truck broke down in Iowa, Colon gave defendant his beeper so that defendant could continue on to New Jersey. Defendant explained that the other beeper found in the truck was his own, but it was “strictly local” to New Jersey. Defendant took Colon’s beeper because Estrella might want to contact him during the trip outside of the area in which his beeper would function. Also, his instructions were that upon arrival in New Jersey he was supposed to bring the truck to Port Security, a parking lot with 24-hour security. He was then to contact Estrella. The beeper Colon gave him had the contact telephone number written on it. Defendant had his own beeper because he was a freelance trucker and he needed employers to be able to contact him with work.

When first asked, defendant testified that he did not tell Trooper Balma that Estrella had paid for his girlfriend to come to California. He believed that he told Balma that his girlfriend’s mother had paid for the airfare and that he, defendant, was going to reimburse her mother. Later, he said that he might have told Balma that he had to call Estrella for permission, and finally defendant admitted that he did not remember what he told Balma, and he may have told him that Estrella paid for the flight. He stated that he was nervous when talking to Balma, because no one was supposed to be in the truck with him and he was worried about getting fined. He also admitted that he had referred to his passenger as his wife because they had been living together for nine years, but they were not actually married.

Defendant testified that the gun tucked into Colon’s waistband in the picture found in the cab of defendant’s truck was a bb gun. He stated that the blue folder in which the registrations were found was kept in the truck, and it was not his folder. During the trip he used the folder as a place to keep his receipts, because in addition to his pay of $800 or $900 he would also be reimbursed for his personal expenses related to the trip. He did not pay any attention to any papers in the folder other than his receipts and the registrations.

Regarding the log books, defendant stated that he was unfamiliar with their format, despite his experience in the industry. He explained that he was almost exclusively a local trucker; other than his two deliveries for Estrella, the furthest he had ever driven was Pennsylvania. He did not use the long-distance driving type of log books for local deliveries.

Defendant testified that he did not know about the secret compartment in the truck and that he did not know that he was hauling anything other than oranges.

The State called Trooper Balma as a rebuttal witness. Balma reaffirmed that in his conversation with defendant, defendant had told him that Estrella had flown defendant’s girlfriend out to California to be with him. Defendant specifically named Estrella as the vehicle owner. Balma denied having testified that defendant explicitly stated that Estrella had paid her way out to California; he said that defendant simply “stated that she was flown out there by Mr. Estrella.” Upon inquiry by the court, Balma testified that when he stopped defendant, defendant produced his driver’s license from his person, but the registrations for the truck were in the folder.

The court acknowledged that the case was “very close” and that the evidence was wholly circumstantial, but convicted defendant. The court stated that “possibly no one item *** or possibly no two or three of them put together could convince me beyond a reasonable doubt that the defendant is guilty. But all of them taken together, the totality of the circumstances in this case lead to that finding.” The court stated with respect to 
People v. Bell
,

“Naturally I would give less weight or it would be less of an inference where the defendant is driving a tractor trailer and may pick it up without checking anything other than the stability. There’s less of an inference there, at least, in my mind than there is in deciding this case than [
sic
] if the drugs are found in his suitcase or glove compartment or trunk or car. That would create a stronger inference. But, that inference stands under the law unless as stated in 
People v. Bell
[,] 53 Ill. 2d 122[, o]ther facts and circumstances might leave a reasonable doubt as to the guilt in the minds of the jury.”

The court stated that the light loads in the trucks driven by both defendant and Colon were

“one of the strongest things that’s, that’s [
sic
] of suspicion and imputed to the knowledge of the defendant is the fact that all of these oranges from looking at the pictures could have been put in one truck and there’d still be room for another big load of oranges. Unless it somehow exceeded the weight. Which may, it, to drive an empty truck from the east coast to the west coast and then bring two trucks back with so few oranges in each one again is certainly a suspicious situation that the defendant knew what was going on [
sic
].”

In convicting defendant, the court also focused on the fact that defendant was to deliver the truck to Port Security, a parking lot. The court stated that it found this unusual, and that although defendant did not have to explain anything, he chose to explain this and the explanation was unsatisfactory.

On defendant’s motion for a new trial, the court allowed the defense to introduce testimony and documents demonstrating that Port Security was a storage facility where people could park trailers or containers taken from ships. There was 24-hour security in the lot and there were “plug-ins” which could run refrigerated units. The court acknowledged that any confusion regarding Port Security had “certainly been cleared up,” but denied the motion for a new trial, stating that even disregarding everything with respect to the parking arrangement at Port Security, the evidence would still support the conviction. The court reiterated that defendant’s suspicions should have been aroused by being flown to California on the first trip, his girlfriend coming out on the second trip, and the light loads in both of the trucks.

Defendant appealed his conviction to the Third District of the appellate court. Justices Holdridge, Stouder, and Lytton comprised the three-judge panel assigned to the case. On December 12, 1995, a document was filed with the clerk of the appellate court for the Third District. This document was in the form of an order issued by the appellate court, and purported to reverse defendant’s conviction on the basis of insufficiency of the evidence. It was authored by Justice Holdridge, and stated that it had the concurrence of Justice Stouder. However, Justice Stouder had died on December 7, 1995, before the document was filed. The document also contained a writing in the form of a dissent, authored by the third member of the panel, Justice Lytton.

The State petitioned this court for leave to appeal pursuant to our Rule 315 (177 Ill. 2d R. 315(a)). The State argued that the document was not a valid order because Justice Stouder had died before it was filed, and also contended that if it was a valid order, it erred in its resolution of the merits of the case. We denied leave to appeal in June 1996. The appellate court’s mandate was then spread of record, and the defendant was released from custody.

In August 1997 the State filed with this court a motion for leave to seek a writ of 
mandamus
 or, in the alternative, for a supervisory order directing the appellate court to vacate the document filed in December 1995 and issue a “valid opinion.” Defendant responded that the December 1995 “order” became final when this court denied leave to appeal, and thus any order directing the appellate court to reconsider his case would violate his guarantees against double jeopardy. This court issued a supervisory order in which we directed the appellate court to “vacate its decision and order of December 12, 1995 ***, and all subsequent orders in that appeal,” and instructed the court to “proceed with the appeal in a manner not inconsistent with this court’s opinion in 
Proctor v. Upjohn
, 175 Ill. 2d 396 (1997).” We denied defendant’s motion for reconsideration. Defendant’s subsequent petition for a writ of 
certiorari
 in the United States Supreme Court was denied. 
Ortiz v. Illinois
, 522 U.S. 982, 139 L. Ed. 2d 380, 118 S. Ct. 444 (1997).

In the appellate court, defendant filed a motion for an order to the effect that the December 1995 filing was a final order not subject to review. In January 1999 the court filed with its clerk a document in the form of an appellate court opinion designated for publication. The filing solely addressed defendant’s motion. Therein, the court stated that by denying the State’s petition for leave to appeal from the December 1995 filing, this court “in effect ruled on, and rejected,” the arguments raised in the petition, specifically the arguments that the December 1995 filing was not a valid order and that if it was a valid order, it reached the wrong conclusion on the merits. Thus, the court reasoned, 
res judicata
 should have prohibited the State from raising either of those issues in its motion for a supervisory order. Accordingly, the court concluded, to vacate the December 1995 filing, as directed by this court’s August 1997 supervisory order, “clearly subjected the defendant to double jeopardy.” However, the court stated that it was “powerless to act upon [its] conclusion” because it was bound to follow this court’s supervisory order and consider the merits of the case “even though by doing so we are clearly violating the defendant’s constitutional rights by subjecting him to double jeopardy.” Accordingly, it directed the parties to brief the merits of the case.

Subsequently, in December 1999, the appellate court affirmed defendant’s conviction in an unpublished order, holding that the evidence sufficed to prove him guilty beyond a reasonable doubt. No. 3–95–0261 (unpublished order under Supreme Court Rule 23).

Defendant petitioned for leave to appeal (177 Ill. 2d R. 315), and alternatively requested an appeal as a matter of right (134 Ill. 2d R. 317). We granted leave to appeal.

ANALYSIS

Defendant raises two issues in this appeal. He first contends that the vacatur of the appellate court’s December 1995 filing violated his guarantee against double jeopardy. Additionally, he contends that the appellate court erred in affirming his conviction in December 1999. We shall address these contentions in turn.

A. Double Jeopardy

Defendant first contends that all of the proceedings subsequent to this court denying the State’s petition for leave to appeal in June 1996 have been in violation of his federal and state constitutional guarantees against double jeopardy. See U.S. Const., amend. V; Ill. Const. 1970, art. I, §10. The double jeopardy clauses are intended to uphold the principle “ ‘that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.’ ” 
People v. Williams
, 188 Ill. 2d 293, 307 (1999), quoting 
Green v. United States
, 355 U.S. 184, 187-88, 2 L. Ed. 2d 199, 204, 78 S. Ct. 221, 223 (1957). The prohibition against double jeopardy “protects against three distinct abuses: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.” 
People v. Placek
, 184 Ill. 2d 370, 376-77 (1998). The protection afforded by the Illinois constitution is no greater than that provided by the federal constitution. 
People v. Levin
, 157 Ill. 2d 138, 160 (1993). Normally, double jeopardy concerns are not implicated by retrying a defendant after a successful appeal of a conviction. However, there is an exception to this rule. A reversal of a conviction based on insufficiency of the evidence is the equivalent of an acquittal in the trial court for double jeopardy purposes and thus bars a subsequent retrial of the defendant. 
Burks v. United States
, 437 U.S. 1, 15-17, 57 L. Ed. 2d 1, 12-13, 98 S. Ct. 2141, 2149-50 (1978); 
People v. Daniels
, 187 Ill. 2d 301, 310 (1999).

Defendant contends that the instant case is governed by 
Burks
. He asserts that the appellate court’s December 1995 “order” became final when this court denied the State’s petition for leave to appeal in June 1996. He maintains that at that point any irregularity in the “order” became irrelevant–he had received the equivalent of an acquittal and the State should forever thereafter have been barred from attempting to prosecute him for the acts which formed the basis of the prior prosecution. He posits that because the appellate court had jurisdiction of the case and the parties in December 1995, the December 1995 “order” was not void, but merely voidable. Accordingly, he reasons, it is immune to collateral attack, and must stand.

We disagree, because there was 
no order
 entered in December 1995. Although the court had jurisdiction over the case and parties, the court never disposed of the case. As we will explain, the document filed with the clerk was wholly without legal effect, and the case in fact remained pending before the appellate court.

The authority of the appellate court derives from the Illinois Constitution. Section 5 of the judiciary article of the constitution provides that “the concurrence of a majority of [an appellate court] division is necessary for a decision.” Ill. Const. 1970, art. VI, §5. In this context the term “division” means “panel.” 145 Ill. 2d R. 22(b). Accordingly, the concurrence of at least two judges is required for the appellate court to render a valid decision. 
Proctor v. Upjohn Co.
, 175 Ill. 2d 394, 396 (1997); 
Cirro Wrecking Co. v. Roppolo
, 153 Ill. 2d 6, 17 (1992); 145 Ill. 2d R. 22(c). When a document in the form of an order is issued without the concurrence of two judges, that document is not a valid judgment. 
Proctor
, 175 Ill. 2d at 396-97.

On its face, the December 1995 filing proclaimed that it did, in fact, have the concurrence of two judges. But one of those judges, Justice Stouder, had died before the opinion was filed. Because his authority to act ceased immediately when by his death he vacated his office, his purported concurrence in the subsequently filed opinion was without legal effect. The reason is clear; until the opinion is filed, any or all of the judges deciding the case remain free to change their minds regarding the outcome. No judge is bound by a vote cast before the opinion is filed. Accordingly, Justice Stouder’s prefiling concurrence cannot be counted in support of the December 1995 filing, so that filing did not receive the concurrence of two judges.

Because the December filing did not have the concurrence of two judges, it was not a decision of the court. Ill. Const. 1970, art. VI, §5; 
Proctor
, 175 Ill. 2d at 396-97. It had no more effect than if one of the judges on the panel decided a case wholly on his own, and filed a document with the clerk in the form of a decision. Because there was no valid order, there is no basis for defendant’s double jeopardy claim.

We recognize that this court gave different instructions as to what should be done when an appellate court panel could not obtain the concurrence of two judges, in 
People ex rel. Director of Finance v. Young Women’s Christian Ass’n
, 74 Ill. 2d 561, 566 (1979). There, no two of the three judges participating in the case could agree, and we stated that because all of the remaining justices in the Fourth District recused themselves from the case, the case could not be submitted to a new panel. We stated that in such a situation the appellate court should summarily affirm the trial court. 
People ex rel. Director of Finance v. Young Women’s Christian Ass’n
, 74 Ill. 2d at 567. In this respect we overrule this case.

Although the appellate court is divided into five districts for purposes of election (Ill. Const. 1970, art. VI, §2), Illinois has but one unitary appellate court. 
People v. Granados
, 172 Ill. 2d 358, 371 (1996); 
People v. Layhew
, 139 Ill. 2d 476, 489 (1990); 
Renshaw v. General Telephone Co.
, 112 Ill. App. 3d 58, 61-62 (1983). Because there is but a single appellate court, there is no reason for a rule that a case must be summarily affirmed absent the agreement of two judges in the district in which the appeal is brought. Should that panel be unable to reach agreement because a judge originally assigned to the case departed the court before the case was decided, another judge may be substituted; if the original panel of three cannot decide the case, the case may be assigned to a new panel. Litigants have no due process right to have cases heard by a particular judge or judges. 
People v. Williams
, 124 Ill. 2d 300, 308 (1988). Even in a situation such as existed in 
People ex rel. Director of Finance
, where all of the other judges in the district had recused themselves from the case, this court has the power to assign judges to the various divisions (145 Ill. 2d R. 22(b)), a power which we can and do utilize when necessary to assign judges from one district to hear and decide cases originally brought in another. See 
Renshaw
, 112 Ill. App. 3d at 62 (noting this practice). The appellate court cannot dispose of a case absent the agreement of two judges.

Returning to the instant case, defendant does not even argue that Justice Stouder’s concurrence was valid. Instead, he contends that the State should be barred at this juncture from arguing to the contrary, under the doctrine of 
res judicata.
 He suggests that after this court denied leave to appeal in June 1996, the appellate court’s December 1995 filing became final and the State should be precluded from assailing it on any bases which the State had already raised, including the argument that the order was not valid and that it erred on the merits.

We reject this argument. The simple answer is that defendant’s 
res judicata
 argument shares with his double jeopardy argument the fatal flaw that there was no order upon which to anchor the doctrine. See 
Rein v. David A. Noyes & Co.
, 172 Ill. 2d 325, 335 (1996) (for 
res judicata
 to apply, there must be a final judgment on the merits).

Defendant urges that our June 1996 denial of leave to appeal constituted a judgment on the merits. We recognize that in its January 1999 filing the appellate court stated that by denying leave to appeal this court “in effect ruled on, and rejected,” the arguments raised in the petition. We have at least two concerns with this document. First, although it was in the form of an opinion to be published, it was not publishable. It did not decide the case–it did no more than dispose of a motion. The case remained before the court until December 1999, when the court filed the unpublished order affirming defendant’s conviction. Under our Rule 23, only decisions of the appellate court may be published. 166 Ill. 2d R. 23(a). We direct the appellate court to designate the January 1999 filing as nonpublishable. Had the court wished to publish its analysis, the proper course would have been to include that analysis in the order disposing of the case.

Moreover, the appellate court erred in its characterization of our June 1996 denial of leave to appeal. It is well settled that our denials of leave to appeal are not decisions on the merits of the case. They “carry no connotation of approval or disapproval of the appellate court action, and signify only that four members of this court, for reasons satisfactory to them, have not voted to grant leave.” 
People v. Vance
, 76 Ill. 2d 171, 183 (1979). Accord 
Guerino v. Depot Place Partnership
, 191 Ill. 2d 314, 319 (2000); 
Koenig v. National Super Markets, Inc.
, 231 Ill. App. 3d 665, 667 (1992); 
United States ex rel. Falconer v. Lane
, 708 F. Supp. 202, 205 (N.D. Ill. 1989).

B. Sufficiency of the Evidence

Defendant also contends that the evidence was insufficient to uphold his conviction. To sustain the charge of controlled substance trafficking which was levied against defendant in this case, the State was required to prove that defendant, with knowledge, brought into this state a controlled substance for the purpose of delivery or with the intent to deliver. 
People v. Frieberg
, 147 Ill. 2d 326, 360 (1992); 720 ILCS 570/401.1(a) (West 1994). Defendant disputes only the State’s proof of his knowledge of the cocaine.

Initially, defendant contends that the trial court infringed upon his presumption of innocence by improperly applying 
People v. Bell
, 53 Ill. 2d 122, 126 (1972). There, we stated that “[w]here narcotics are found on premises under the defendant’s control, it may be inferred that he had requisite knowledge and possession, absent other facts and circumstances which might leave a reasonable doubt as to guilt in the minds of the jury.” This presumption has been extended to automobiles under a defendant’s control. See, 
e.g.
, 
People v. Wells
, 241 Ill. App. 3d 141, 146 (1993). Defendant contends that the presumption should not apply in this case, where drugs were found in a secret compartment in a vehicle driven for hire which the driver did not own. Defendant notes that the Fifth Circuit Court of Appeals has held that when drugs are in secret compartments, mere control of a vehicle is not sufficient to demonstrate knowledge on the part of the driver. See, 
e.g.
, 
United States v. Resio-Trejo
, 45 F.3d 907 (5th Cir. 1995) (and cases cited therein). See also 
Whitney v. State
, 726 N.E.2d 823 (Ind. App. 2000) (adopting Fifth Circuit’s rule). Rather, there must be additional evidence suspicious in nature or indicating guilty knowledge. 
Resio-Trejo
, 45 F.3d at 911. Other states have also held that knowledge cannot be based on mere presence in a vehicle owned by another where the contraband is out of sight. See 
Ferrell v. State
, 649 So. 2d 831 (Miss. 1995); 
Commonwealth v. Garcia
, 409 Mass. 675, 569 N.E.2d 385 (1991). New York has codified a presumption that every person in an automobile is in knowing possession of any controlled substance present therein, but carved out an exception for “a duly licensed operator of an automobile who is at the time operating it for hire in the lawful and proper pursuit of his trade.” N.Y. Penal Law §220.25(1)(a) (McKinney 2000).

We agree that we would be dubious of a result based solely on a presumption of knowledge in a case such as the instant one, where drugs were found in a secret compartment in the trailer of a vehicle driven for hire, which the driver did not own. However, the State does not argue in favor of such a rule. Rather, the State contends that there is sufficient circumstantial evidence in this case to uphold the result reached by the trial court.

In reviewing this claim, the question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, viewing the evidence in the light most favorable to the State. 
People v. Perez
, 189 Ill. 2d 254, 265-66 (2000). It is the trier of fact’s responsibility to determine the witnesses’ credibility and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence; we will not substitute our judgment for that of the trier of fact on these matters. 
People v. Brooks
, 187 Ill. 2d 91, 132 (1999). However, although determinations by the trier of fact are entitled to great deference, they are not conclusive. Rather, we will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant’s guilt. 
People v. Smith
, 185 Ill. 2d 532, 542 (1999) (jury trial); 
People v. Pellegrino
, 30 Ill. 2d 331, 334 (1964) (bench trial).

In this case there are several pieces of uncontradicted evidence which weigh in defendant’s favor. For instance, Trooper Balma’s testimony regarding the trucking industry tended to exculpate defendant, specifically his testimony that a driver would normally only check if the load was secure before driving; that the diamond plate panel could not be seen from the rear of the truck; and that when he was a driver he drove the load he was given where he was told, even when he did not think his employer was making the best possible use of the truck. Also supporting defendant are the facts that defendant not only gave the police permission to search the vehicle after being told he was free to leave, but informed the police–both Balma and, later, Malone–that Colon was also driving a truck on the same route. The trial judge acknowledged that this latter fact would seem to militate in defendant’s favor, but stated that he was “never surprised at some of the things that are done.”

Still, the State maintains that there is sufficient circumstantial evidence of defendant’s guilt to uphold his conviction. Knowledge may be, and ordinarily is, proven circumstantially. 
People v. Crane
, 308 Ill. App. 3d 675, 683 (1999); 
People v. Nash
, 282 Ill. App. 3d 982, 985 (1996); 
People v. Weiss
, 263 Ill. App. 3d 725, 731 (1994); 
People v. Farrokhi
, 91 Ill. App. 3d 421, 427 (1980). 
Cf.
 
People v. Hickey
, 178 Ill. 2d 256, 292 (1997) (“ ‘[i]n a prosecution for home invasion, knowledge may be proven by circumstantial evidence so long as the State presents sufficient evidence from which an inference of knowledge can be made’ ”), quoting 
People v. Ramey
, 240 Ill. App. 3d 456, 462 (1992). In this case, the State relies on the following evidence adduced at trial: (1) defendant’s connection to other drug smugglers; (2) inconsistent and suspicious testimony by defendant; (3) the value of the cocaine; (4) the presence of two pagers in the cab of the truck; and (5) defendant’s nervousness. The State contends that these facts, taken in concert, suffice to uphold defendant’s conviction.

The State’s assertion that “the defendant, Colon, Then/Fernandez, and Estrella were intimately associated with one another’s activities” fails to find support in the evidence. Other than defendant’s admission that he was a friend of Colon, the only evidence linking defendant and any of the other persons mentioned are (1) defendant’s admission that he had met Estrella, who owned the truck defendant was driving; (2) the August 1994 truck repair bill in Fernandez’s name for the truck Colon was driving, found in the folder containing the registration of the truck defendant was driving; and (3) several old parking receipts, found somewhere in the cab of the truck defendant was driving. The unrebutted evidence, established not only by defendant’s testimony but also by the log books in his truck, was that he had driven for Estrella only once before the trip during which Trooper Balma stopped him. The three-month-old truck repair bill and the parking receipts simply do not bear the weight placed on them by the State. The evidence presented at trial is no basis for an inference that defendant and the others were “intimately associated.” Moreover, as the trial court stated, the question is not whether there was a drug ring operating; clearly there was. The question is what defendant knew.

The next evidence upon which the State relies is “inconsistent and suspicious testimony by the defendant.” For instance, the State contends that defendant testified inconsistently about exactly when Estrella hired him to go to California. We see no inconsistency here. Defendant testified that when he met Estrella at the restaurant he agreed to drive for him, but he did not find out the exact date he would be going until Estrella called him later.

The State also observes that defendant claimed to have called Estrella from California to ask permission for his girlfriend to come out but could not remember Estrella’s telephone number at trial. We again see no inconsistency. Defendant never claimed to have dialed from memory, and his failure to recollect the number is further explained by his uncontradicted testimony that Estrella’s telephone number was written on Colon’s pager.

The State further points to defendant’s inability to give the address of Star Produce or Rocky Road Trucking at trial. But Officer Malone testified that defendant had given him the street and town where Star Produce was located during the post-arrest interview. A few hours after the interview Malone telephoned the New Jersey authorities to inform them of this information. Defendant’s bill of lading and the written warning which Trooper Balma issued to defendant also contain the address of Star Produce, and the town in which Rocky Road Trucking was located was written in defendant’s log books. These facts derail the State’s implication–and the trial court’s speculation–that there were no such companies as Star Produce or Rocky Road. The State produced no evidence that Star Produce or Rocky Road did not exist, despite being in possession of facts enabling the State to make such a determination. Moreover, even assuming 
arguendo
 that the companies did not exist, we would see no reason to impute this knowledge to defendant or to fault him for failing to investigate his employer.

The State denigrates defendant’s testimony that he was unfamiliar with the log books, in light of his 17 years of involvement with the trucking industry. However, this ignores his uncontradicted testimony that he was only a local driver and the log books were of a type only used for long hauls. We note that the State did not impeach this testimony through its rebuttal witness, Trooper Balma.

The State also notes that defendant testified that he had known Colon for 20 years but did not know his address. This is peculiar, but we fail to see the significance. A great deal of the State’s case was devoted to attempting to demonstrate links between defendant and Estrella and the other persons who had driven for him, including Colon especially. The State is not contending that defendant’s ignorance of Colon’s address implies that they did not in fact know each other. Nor does the State contend that defendant was feigning ignorance of Colon’s address in order somehow to protect Colon. Indeed, such a claim would be somewhat perplexing even beyond the question of what harm it could do Colon for defendant to testify as to his address, in light of the facts that (1) defendant knew that Colon had already been arrested for cocaine trafficking, and (2) Colon had been arrested 
because defendant had told the police about him
.

In the context of discussing defendant’s testimony, the State also notes the circumstances of the two trips defendant made for Estrella. The State reiterates that according to defendant’s own testimony, first he and Colon flew out to California and drove back together, for which defendant was paid $900, then on the second trip he and Colon drove from New Jersey to California, stayed in California for four to five days, then returned to New Jersey in separate trucks. For this trip he was also to be paid $800 or $900. On the return trip neither defendant’s truck nor Colon’s truck was more than half full. As previously noted, the fact that neither truck was full was one of the key pieces of evidence upon which the trial court relied in convicting the defendant.

However, the weight of this evidence depends almost entirely on the presumption that defendant 
knew
 Colon’s truck was not full. Defendant testified that Colon had loaded first and he, defendant, was not even present when Colon’s truck was loaded. Defendant stated that he believed that he just got what was left over. The State introduced no evidence showing that defendant knew what Colon was carrying. We note that the State was in possession of both defendant’s and Colon’s bills of lading, but only introduced defendant’s into evidence. That document showed the exact time that defendant was loaded and the company which did the loading. If defendant’s story regarding the loading procedure was a fabrication, the State had the means in its possession to so demonstrate. It did not do so. There was no evidence from which defendant’s knowledge of the light load Colon was carrying could be inferred.

The trial court also found the financial circumstances of the trip unusual. The court believed defendant’s suspicions should have been aroused when he was flown out to drive back on the first trip because he should have known that the employer could get a California driver to make the trip. The court also stated that defendant could not have made any money on the second trip if he was paid only $900 to drive round trip between New Jersey and California, waiting for four or five days between trips and paying for a hotel and meals during that time. However, defendant’s testimony was that Colon paid for all meals and hotel rooms except for the two days when defendant and his girlfriend stayed in a separate room together in California, which defendant thought cost approximately $45. Nor was there any basis for the inference that defendant knew before leaving New Jersey that he would be delayed in California. He testified that he was only so informed upon arrival. The daily pay would have been much better if not for the delay.

Moreover, the trial court apparently accepted defendant’s testimony that he had never driven further than Pennsylvania before working for Estrella, stating, “here is a driver who has never been beyond Pennsylvania and going coast to coast with Colon.” We cannot see any basis for imputing to this defendant knowledge that he was transporting narcotics based on the fact that he was driving less than a full load of perishable fresh produce to the east coast during winter. Further, the court relied in part on the fact that defendant had been flown to California, which occurred not on this trip, but the previous one. This fact is remote to the question of defendant’s knowledge that he was transporting cocaine on this trip.

Finally, as previously noted, Trooper Balma admitted that when he, as a trucker, had believed that his employer was not making an efficient use of his truck or time, he still drove where he was told. It was simply not his job to question the economics of the trip he was being asked to take.

The State also contends that the high value of the contraband found in this case constitutes a proper basis for an inference that defendant was not simply an unwitting “mule,” citing 
United States v. Pollock
, 926 F.2d 1044 (11th Cir. 1991). The defense contends that the value of the drugs is equally susceptible to the opposite inference. That is, the defense argues that a smuggler might prefer that a driver 
not
 know the drugs are there, because of the risk of theft of a valuable shipment. Although we generally leave inferences to the trier of fact, the trial court made no mention of the value of the drugs in explaining its ruling. We note that 
Pollock
 is based on the notion that one would not ordinarily put an extremely valuable cargo in the hands of a stranger. However, in this case, defendant was supposed to make the entire trip in the company of Colon. Colon introduced defendant and Estrella and Colon’s vehicle contained drugs worth over three times as much as the drugs in defendant’s truck. Accordingly, even if defendant was unaware of the drugs in his truck, the trafficker would not truly have “entrust[ed] a shipment” of considerable worth to an outsider (
Pollock
, 926 F.2d at 1050), because Colon was with him the entire time. We take judicial notice that Colon was convicted of controlled substance trafficking and sentenced to 60 years’ imprisonment for the incident in question. 
People v. Colon
, No. 3–95–0486 (1998) (unpublished order under Supreme Court Rule 23). The fact that Colon was supposed to be with defendant the entire trip lessens any intrinsic weight to be accorded to the value of the drugs.

The State also argues that the large amount of cocaine found in the truck gives rise to an inference that the two pagers “were part of the tools of the trade of the drug business.” The State provides no authority for this inference or any explanation as to how or why we should impute knowledge of the drugs to defendant because of the presence of the pagers. Defendant explained at trial that (1) he carried his own pager with him all the time, and he had one because he was a freelance driver and he needed prospective employers to be able to contact him; (2) he was supposed to contact Estrella when he dropped off the cargo and Estrella’s telephone number was written on the pager Colon gave him; and (3) he also had Colon’s pager because Estrella might wish to contact him during the trip to see where he was and his own pager only operated in New Jersey and New York. The State presented no evidence to impeach or cast doubt on defendant’s explanations.

The final factor the State cites in favor of upholding defendant’s conviction is his nervousness during the traffic stop. Defendant argues that according to the testimony he was most nervous when he was being interrogated regarding his girlfriend. He contends that, accordingly, his nervousness should be interpreted as relating to her presence, as he explained at trial, rather than the cocaine. Defendant’s explanation is somewhat supported by Trooper Balma’s testimony that generally only the driver or drivers of the truck are allowed to be in the truck. But Balma testified that defendant was nervous even when he was not being questioned about his passenger, as did Trooper Miroux. We agree with the State that defendant’s nervousness militates in favor of a finding of knowledge. See, 
e.g.
, 
People v. Roberts
, 263 Ill. App. 3d 348, 353 (1994); 
People v. Peter
, 220 Ill. App. 3d 626, 630 (1991). Still, as the State concedes, although nervousness does weigh in favor of a finding of knowledge, it is not in and of itself sufficient to uphold such a finding. 
United States v. Diaz-Carreon
, 915 F.2d 951, 954 (5th Cir. 1990) (finding in that case that nervousness was linked to the presence of the drugs because the defendant, before being told that drugs had been found, volunteered the statement “If the truck is loaded, I didn’t know about it”).

In a criminal case it is our duty carefully to examine the evidence adduced at trial. We must give due consideration to the fact that the fact finder saw and heard the witnesses. But “[i]f, after such consideration we are of the opinion that the evidence is not sufficient to establish defendant’s guilt beyond a reasonable doubt, it is our duty to reverse the judgment of conviction.” 
People v. Bartley
, 25 Ill. 2d 175, 180 (1962); 
People v. Jefferson
, 24 Ill. 2d 398, 402 (1962). “[A] judgment of conviction can be sustained only upon credible evidence that removes all reasonable doubt of guilt, and where the evidence of the prosecution is improbable, unconvincing or contrary to human experience, we will not hesitate to reverse” that conviction. 
People v. Stevenson
, 25 Ill. 2d 361, 365 (1962). We cannot sustain defendant’s conviction on the evidence adduced in this case. The circumstantial evidence was scant at best, and appears even weaker in light of the evidence supporting a not guilty finding.

Of course, a fact finder need not accept the defendant’s version of events as among competing versions. 
People v. Dean
, 207 Ill. App. 3d 640, 643 (1990). But in this case much of the evidence supporting defendant came not only from defendant, but from Trooper Balma, the State’s own witness. He testified that a driver would normally do no more than check if the load was secure before driving, and acknowledged that the diamond plate panel could not be seen from the rear of the truck. Balma also testified that he did not make it his business, as a driver, to question the economics of a trip he was being paid to take, even when he did not think his employer was making the best possible use of the truck. Other facts indicative of defendant’s innocence are wholly uncontradicted, 
i.e.
, defendant’s consent to the search and his telling the police that Colon was also driving a truck on the same route.

We recognize that this case involves a very serious crime. But, as this court recently observed, this does not affect the bedrock principle at issue:

“What is involved here is the standard of proof which is applicable to all crimes. That is to say, conviction beyond a reasonable doubt. Whether the crime charged be trespass, shoplifting, armed robbery, or murder, the test is the same. The burden of meeting this standard falls solely on the prosecution. If it fails to meet this burden, a defendant is entitled to a finding of not guilty. No defendant is required to prove his innocence.

While a not guilty finding is sometimes equated with a finding of innocence, that conclusion is erroneous. Courts do not find people guilty or innocent. They find them guilty or not guilty. A not guilty verdict expresses no view as to a defendant’s innocence. Rather, it indicates simply that the prosecution has failed to meet its burden of proof. While there are those who may criticize courts for turning criminals loose, courts have a duty to ensure that all citizens receive those rights which are applicable equally to every citizen who may find himself charged with a crime, whatever the crime and whatever the circumstances. When the State cannot meet its burden of proof, the defendant must go free. *** It is no help to speculate that the defendant may [be guilty]. No citizen would be safe from prosecution under such a standard.” 
Smith
, 185 Ill. 2d at 545-46.

CONCLUSION

For the reasons above stated, we reverse the judgment of the appellate court and reverse defendant’s conviction and sentence.

Judgments reversed.