THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD D. REHER, Defendant-Appellant.

Second District   No. 2—04—0006

Opinion filed October 31, 2005.

G. Joseph Weller and Paul Alexander Rogers, both of State Appellate Defender's Office, of Elgin, for appellant.

Joseph E. Birkett, State's Attorney, of Wheaton (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and David R. Akemann, of Elgin, for the People.

JUSTICE HUTCHINSON delivered the opinion of the court:

Following a bench trial, defendant, Ronald D. Reher, was convicted of violating an order of protection (720 ILCS 5/12—30 (West 2002)). He was sentenced to two years' probation. He appeals, arguing that the State failed to prove his guilt beyond a reasonable doubt. We agree and reverse.

On September 21, 2001, the trial court entered against defendant a plenary order of protection that protected Ezeldra Outlaw and Ashley Reher, the minor child of defendant and Outlaw. The order listed Outlaw's address as 1155 South Finley #30 in Lombard and defendant's address as 590 Gunderson #67 in Carol Stream. Among the order's provisions were that defendant could not engage in "harassment" of the protected persons or have any kind of "contact" with them. The order remained in effect until September 19, 2003.

On June 27, 2003, the State filed an information alleging that, on October 22, 2002, defendant "did intentionally commit an act which was prohibited by the Order of Protection in that said defendant harassed Ezeldra Outlaw *** in that said defendant stated to same 'you and Ashley are gonna be sorry bitch', while at K-Mart located at 345 Roosevelt Rd., Lombard." The State subsequently amended the information to allege that defendant "had contact with *** Ezeldra Outlaw [that] was harassing in nature in that said defendant stated to Ezeldra Outlaw, 'You and Ashley are gonna be sorry bitch' while located at 345 W. Roosevelt Rd., Lombard."

At trial, Outlaw testified as follows. On October 22, 2002, she lived at 1155 South Finley in Lombard, "directly across from [a] K mart." About 5:45 p.m., she was walking toward the K mart and saw "a guy fiddling with a bike" near the entrance. He seemed to be taking "a long time" to do what he was doing. Outlaw did not see the man's face or otherwise recognize him until she was about two feet away, at which point she saw that he was defendant. Defendant then looked at Outlaw and said, " 'you and Ashley are going to be sorry, bitch.' " Outlaw became "very scared" and told defendant that he was not supposed to be there. She then ran into the store and called 911.

David Thiede, a Lombard police officer, testified as follows. On October 22, 2002, about 5:45 p.m., he was dispatched to the K mart "at the corner of Finley and Roosevelt Road." Having received a description of defendant, Thiede saw him riding a bicycle "next door" to the K mart. Defendant saw Thiede approaching and stopped. Thiede asked him what had happened at the K mart. Defendant replied that he had been there to shop for die-cast cars and had purchased three, showing Thiede the cars and a K mart receipt bearing the date of October 22, 2002, and a time of 5:35 p.m. The sales receipt was admitted into evidence. Defendant told Thiede that he had been attaching the cars to his bicycle when Outlaw approached him and told him that he was not supposed to be there. She then went into the store and called 911. Defendant told Thiede that he was aware of the order of protection and had not conversed with Outlaw. Defendant stated that he got on his bike and rode away.

Thiede asked defendant why he had ridden his bicycle to the K mart, as he lived at least "a couple of miles" away, in Carol Stream. Defendant replied that he rode his bicycle all the time because he had lost his driver's license and that "it was nothing" for him to ride to the K mart. He added that he had previously stopped at a Target, which was even farther away from his home, but that the Target did not have the cars that he was seeking. Thiede asked defendant whether he knew where Outlaw lived. Defendant stated that he knew "where she used to live" but thought that she had moved, as "the apartment was dark and it looked vacant." Nevertheless, he thought that she still must live in the area, as she had walked to the K mart.

Defendant testified as follows. His bicycle had been his primary mode of transportation since 1994, and it was not unusual for him to ride 10 to 15 miles per day. On October 22, 2002, he rode about six miles to a Target in Lombard, looking to buy die-cast cars for his nephew, who collected them. After purchasing some items at the Target, he proceeded to the K mart, where he purchased some more. He was in the store about 20 minutes. When he left, he went to his bicycle, which was "directly in front of the door." He tried to put the cars into a bag that hung on a rack on the back of the bicycle, but they would not fit. Defendant then tried to strap them down to the top of the rack. He was aware of the order of protection, but he did not see Outlaw approach him, as she did so from behind. When Outlaw reached him, defendant looked at her, and she said that he was not supposed to be there. Outlaw then went into the store and called the police. Defendant testified that, after he saw Outlaw, he did not say anything to her. Defendant told the investigating officer that he knew where Outlaw used to live but was not sure whether she still lived there.

Defendant acknowledged that two Target stores and a Wal-Mart store were at least as close to his home as were the stores in Lombard. Defendant testified that he had ridden to all the closer stores and had already examined the die-cast cars for sale there. He rode to the Target and the K mart stores in Lombard simply because he had not checked their collections.

Although it found Outlaw's testimony "extremely credible," the trial court "didn't believe" that defendant had verbally threatened her and Ashley. Nevertheless, the trial court determined that defendant had violated the order of protection by making "contact" with Outlaw, finding as follows:

> "I'm very clear on where everybody here was living and how this K mart is on a very busy intersection, a major intersection.
>
> I can personally think of three to four Targets, K marts, Wal[-M]arts *** that aren't anywhere near this. *** I find it very bizarre that [defendant] was in this area particularly knowing and expressing to the police officer, and this is what convinced me, he knew where she lived. Had been watching her apartment. ***
>
> So I do believe that given his statements to the officer he knew she was there."

On those grounds, the trial court convicted defendant, and defendant timely appealed.

When a defendant argues that the evidence was insufficient to sustain his conviction, our inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). Here, defendant specifically contends that, because the evidence established only that his encounter with Outlaw was coincidental, the State failed to prove beyond a reasonable doubt that he committed a criminal violation of the order of protection. We agree.

We begin our analysis with *People v. Mandic*, 325 Ill. App. 3d 544 (2001), which not only sets out the relevant law but also provides an instructive factual contrast. There, an order of protection required the defendant to "stay away" from his ex-wife and their children. *Mandic*, 325 Ill. App. 3d at 547. Nevertheless, despite having been told that his ex-wife and children were expected to attend a service at a particular church on a particular day, the defendant entered the church on that day and remained there even after confirming that his children were present. Following the service, the defendant entered the church's social hall, where an attorney warned him that he was violating the order of protection. Disregarding that opinion, the defendant remained until his children emerged from Sunday school and entered the hall,

where the defendant hugged and kissed them. The trial court convicted the defendant of violating the order of protection.

On appeal, we first determined that "a violation of a stay-away order does not encompass aimless, unintentional, or accidental conduct." *Mandic*, 325 Ill. App. 3d at 549. In light of the possibility that, purely coincidentally, a defendant and a protected person may appear in the same public place at the same time, we stated that whether a defendant in such circumstances is intentionally violating a stay-away order depends on various factors, including "the size of the public area, the total number of people present, the defendant's purpose for being present, the length of time, and when the defendant knew or should have known that a protected party would be present." *Mandic*, 325 Ill. App. 3d at 549. Although we noted that the defendant's physical contact with his children obviated the need to resolve whether his mere presence violated the stay-away order, we concluded that such presence supported the trial court's finding that the defendant "intentionally violated the order of protection by creating the conditions that led to [the] contact." *Mandic*, 325 Ill. App. 3d at 550.

Here, defendant was not charged with violating a stay-away order; rather, pursuant to the amended information, he was charged with violating a prohibition on "contact," by appearing at the K mart and verbally threatening Outlaw and Ashley. The trial court discredited Outlaw's testimony about the threat, however, and we must defer to that determination. See *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001) (we will not substitute our judgment for that of trier of fact on determination of witnesses' credibility and resolution of evidentiary conflicts). Thus, we now face squarely the issue that we alluded to in *Mandic*, *i.e.*, whether defendant was properly convicted of violating the order of protection by merely appearing in a public place at the same time as Outlaw. Assuming that such an appearance may constitute "contact" just as it may violate a stay-away order, we hold that the State failed to prove beyond a reasonable doubt that defendant's violation was intentional.

Of the factors that we set out in *Mandic*, none supports defendant's conviction. First, the size of the relevant area, and second, the number of others who were present at the relevant time, were not specifically revealed by the evidence. However, common sense suggests that the space in front of a K mart about 5:45 p.m. is not particularly small or desolate. Indeed, apparently from its own knowledge, the trial court noted that "this K mart is on a very busy intersection." Third, defendant established, through uncontradicted testimony and documentary evidence, that he was at the K mart for a legitimate

purpose, *i.e.*, to shop. Fourth, again without contradiction, defendant testified that he was at the store for only about 20 minutes, and both Outlaw and defendant seemed to agree that their actual encounter lasted only a few seconds. Finally, and perhaps most importantly, the State presented no evidence that defendant knew or should have known that Outlaw would appear at the store when she did.

The contrast between *Mandic* and the present case is stark. In *Mandic*, the defendant entered a church, knowing that his children would be inside, and he stayed on the premises even after the service had ended. Any assertion that the encounter was a mere coincidence would have been absurd. Here, however, defendant entered a store, bought some items, exited, and apparently spent a few minutes attempting to affix his items to his bicycle. The record contains no evidence that defendant knew that Outlaw was approaching the store while he was shopping there. Defendant testified that, after he saw Outlaw, he did not say anything to her. As noted above, the trial court stated that it did not believe Outlaw's testimony that defendant had threatened her. Based upon the evidence appearing in the record, we do not believe that a reasonable trier of fact could have concluded beyond a reasonable doubt that defendant had intentionally violated the order of protection.

The trial court's reasoning does not persuade us otherwise. The trial court found "bizarre" that defendant happened to shop at this K mart, which happened to be right near Outlaw's home, when he could have shopped at "three to four" other stores closer to his own home. The trial court further noted that, according to what he told Thiede, defendant knew where Outlaw lived and "[h]ad been watching her apartment," at least to the extent necessary to observe that the apartment "looked vacant." The trial court concluded that defendant "knew she was there." In sum, the trial court's reasoning was that, because defendant knew where Outlaw lived, and because he decided to shop at the K mart when he had several alternatives, his encounter with Outlaw was intentional.

We find little significance in the evidence that defendant knew where Outlaw lived. Indeed, as Outlaw's address was on the face of the order of protection, defendant's knowledge of it may be taken as a given. We also acknowledge that, when defendant chose to shop at the K mart rather than a different store, he traveled closer to Outlaw's home than perhaps he had to. However, the State still failed to present any evidence that he knew or should have known that Outlaw would appear at the store in the brief time that he was there. The State did not offer any evidence that Outlaw worked at the store or that she shopped there either often or regularly. Based upon such evidence, we

hold that no rational trier of fact could have found that defendant intended the encounter. At most, the evidence showed that the encounter was a coincidence. We thus hold that the State failed to prove defendant's guilt beyond a reasonable doubt and conclude that defendant's conviction must be reversed.

For the foregoing reasons, the judgment of the circuit court of Du Page County is reversed.

Reversed.

O'MALLEY, P.J., and BYRNE, J., concur.