THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD T. TAYLOR, Defendant-Appellant.

Fourth District No. 4—02—0408

Argued December 16, 2003.—Opinion filed January 30, 2004.

Michael J. Pelletier and Rebecca I. Levy (argued), both of State Appellate Defender's Office, of Chicago, for appellant.

Barney S. Bier, State's Attorney, of Quincy (Norbert J. Goetten, Robert J. Biderman, and Thomas R. Ewick (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In April 2002, a jury convicted defendant, Richard T. Taylor, of criminal sexual assault (720 ILCS 5/12—13(a)(2) (West 2000)) for committing an act of sexual penetration on the victim, N.C., by placing his fingers in her vagina while she was unable to give consent because she was asleep. The trial court later sentenced him to seven years in prison.

Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) he was denied a fair trial when the trial court admitted evidence that he had refused to make a tape-recorded statement for the police; (3) he was denied a fair trial when the prosecutor referred to him as a "predator" during closing argument; and (4) the court failed to properly admonish him regarding his appeal rights in accordance with Supreme Court Rule 605(a) (210 Ill. 2d R. 605(a)). We affirm and remand with directions.

## I. BACKGROUND

At defendant's April 2002 jury trial, N.C. testified that in September 2001, she and her son, Gabriel, moved into a house at 621 N. 13th Street in Quincy. Gabriel's father was defendant's son, Rick Taylor. Although N.C. and Rick were no longer romantically involved, defendant and his wife, Diane Taylor, maintained a relationship with N.C. and Gabriel. Defendant and Diane often took care of Gabriel when N.C. worked nights, and defendant stopped by frequently to help N.C. with household repairs, such as installing a ceiling fan and a lock on the front door. Diane and N.C. worked at the same local bar.

In October 2001, N.C. was romantically involved with Tony Magliochetti. At that time, Tony was attending college in Macomb. On weekends, he would often return to Quincy and stay with N.C. for the weekend.

On Friday night, October 12, 2001, N.C. did not expect that Tony would be visiting, but occasionally he came to Quincy even though he had not initially planned to do so. N.C. was scheduled to work from 4 until 10 p.m., and Gabriel was staying with a friend in the neighborhood. N.C. had planned to pick up both Gabriel and his friend after work so they could spend the night at her house. However, N.C. had to work later than planned, and when she arrived to pick up Gabriel and his friend, they were asleep. N.C. and Gabriel's friend's mother decided to leave the boys where they were.

N.C. returned home, and then around 11 p.m., she went to a birthday party at another friend's house. N.C. had two glasses of beer at the party and went home around 1:30 a.m. When N.C. arrived home, she locked the front door and turned off the lights. She then went into her bedroom and closed the door. She went to bed wearing only a big sweatshirt.

N.C. was later awakened by the feeling of someone's fingers inside her vagina and one of her legs being pushed so as to spread her legs apart. She then felt a mouth on her vagina. She reached down and felt the head of the person in bed with her. When N.C. realized the hair did not feel like Tony's (a short "buzz" cut), she jumped out of bed. She then saw defendant sit up, and she started screaming at him to get out. However, defendant just sat there. As N.C. continued to scream, defendant got up and left the bedroom, closing the door behind him. N.C. picked up her cordless phone and got back under the covers. Defendant then walked back into the bedroom and pulled the covers off of the bed. N.C. thought he was going to kill her and started screaming again for him to get out. Defendant said, "I'm drunk," and then left. After she heard defendant leave, she went to the front door and locked it. Then she got back in bed and called her sister, Susan

Moore. She was upset and crying, and she told Susan that defendant came into her room.

Approximately five minutes after she got off the phone, Susan arrived at N.C.'s house. Susan called their cousin, Chad, and then the police. When asked why she did not call the police herself, N.C. replied, "[b]ecause I didn't know what I should do first, because it was going to affect so many people." She recalled that the incident occurred around 4 a.m.

About 15 minutes later, Quincy police officer Gabe Vanderbol arrived. N.C. was not immediately able to talk with him because she was embarrassed and scared. After she told him what happened, Vanderbol drove N.C. and Susan to the hospital. They arrived at the hospital shortly after 5 a.m.

N.C. further testified that a couple of nights before the incident, defendant telephoned her and told her that he had left a surprise for her in her mailbox. She did not retrieve it that night. The next morning, he called again and asked if she had received the package, and she said she had not. He then told her it contained edible underwear. N.C. felt embarrassed and did not know what to say. Defendant said it was "just a joke." N.C. later retrieved the package and put it in a kitchen drawer without opening it. She never discussed with defendant her feelings about receiving the underwear because she wanted it to be forgotten. She acknowledged that the day after receiving the package, she went with defendant to buy a computer desk, which he then set up at her house.

N.C. also acknowledged that about one year earlier, on the dance floor at a wedding reception, defendant had said something about going back to a hotel with him. N.C. believed he was joking.

N.C. further testified that during the October 13, 2001, incident, she never gave defendant consent to touch her or penetrate her. She did not consent to defendant's entering her house that morning. N.C. denied giving defendant a key to her house. However, she did not know with certainty that he did not have one. She also denied (1) ever offering any physical or sexual contact to defendant, and (2) having an intimate physical relationship with him.

N.C. further denied knowing as far back as the wedding reception that defendant had personal feelings toward her. She never made any sexual advances toward defendant. She acknowledged that she did not feel threatened by defendant prior to the incident.

N.C. knew that Diane was out of town on the weekend of the incident, but she denied that she had agreed to meet defendant after work on Friday night to go dancing at Backwaters, an after-hours club. N.C. did not remember having a conversation with defendant

about a week earlier, during which he offered to have sex with her and she replied that she would keep that in mind. She had no plans to go dancing with defendant on that Friday night; she had told defendant that she had arranged to take Gabriel and his friend home with her that night.

Vanderbol testified that around 5:05 a.m. on October 13, 2001, he was dispatched to N.C.'s house. Susan answered the door, and Vanderbol was not initially able to talk to N.C. When Vanderbol spoke with N.C., she was "visibly distraught" and "upset about something." He further described N.C. as follows: "She was crying, there were tears that I could see rolling down her face. She—I asked her if, you know, what was the matter, and she then began to cry very loudly and started taking in deep breaths in order to—while she was crying." After two or three minutes, she was able to talk to Vanderbol about what had happened. At times she had difficulty composing herself to answer his questions. After they talked, he transported N.C. and Susan to the emergency room.

Later that morning, Vanderbol interviewed defendant at the police station. Vanderbol read defendant his rights, and defendant acknowledged that he understood them and agreed to talk with Vanderbol. When Vanderbol asked defendant if he had gone anywhere in the early morning hours, defendant said that he had been drinking at the Elks Lodge and then went straight home. When Vanderbol asked him how much he had had to drink, defendant said "too much." (Vanderbol detected a "strong odor of alcoholic beverage" on defendant.) After Vanderbol told defendant that he had information indicating that defendant had not gone straight home, defendant admitted that he had gone to N.C.'s house.

Defendant told Vanderbol that N.C.'s front door was shut but not locked, and he only had to push it and it opened. He did not have a key. Once inside, he yelled for N.C. but did not hear a response. He went into Gabriel's room and found that Gabriel was not there. He then went into N.C.'s room and yelled her name again. (He did not indicate to Vanderbol whether she responded.) The room was very dark. He made his way over to the bed and could feel that N.C. was lying on it. He shook N.C., and she did not wake up. He then got underneath the comforter and kissed N.C. on the belly, put his finger inside her vagina, and kissed her vagina. He acknowledged that he had to spread N.C.'s legs apart. When Vanderbol asked him if he had licked her vagina, he said that he had only kissed it. After he kissed N.C. on the vagina, she woke up and told him that he had to leave. He acknowledged that he returned to the bedroom and pulled the covers off of N.C. "to apologize." He said to N.C., "I'm sorry, I am drunk, I'm drunk."

Vanderbol further testified that defendant "stated that the whole incident was stupid and that it should not have happened. He stated that he thought that he was going to lose his job and his wife over the incident and that he was drunk and that it should not have happened." Defendant did not (1) say anything to Vanderbol about how he and N.C. had prearranged this encounter, (2) comment on any intimate relationship between them, or (3) say that N.C. had been making sexual advances or leading him on. At the end of the interview, defendant said to Vanderbol, "She's really pretty, isn't she?"

Defendant testified that after N.C. moved into her 13th Street house, he visited two to three times a week, mainly to do repairs. Most of the time when he stopped by N.C.'s house, she would be wearing a T-shirt and cutoff shorts. On one occasion, she wore a T-shirt that said "you do me, and then you can do me again." Defendant further testified as follows regarding that occasion:

"A. *** I asked her at that time if, how her mother felt about her wearing that type of T-shirt. And she had informed me that her mother doesn't understand. She wouldn't even know what that meant. And then I told her that, well, I sure know what it means.

Q. And what was her reaction to that?

A. She just kind of looked at me and smiled and then went on.

Q. Did you have other conversations with her?

A. Yes. ***

* * *

As she was leaving, I was still there putting the light in. *** I told her at that time that I was not—that I was serious about what I said about the T-shirt to her, and she looked at me as she was going out the door and said she'd keep that in mind. Then she left.

Q. And did you have other conversations with her of a sexual nature?

A. We had talked one time—I mean, we had talked several times about it. I mean, I told her probably four or five times on different occasions that I would do her, and that was [sic] my words.

* * *

Q. And based upon what you observed from her, did she understand what you said?

A. Yeah, she just smiled at me on three or four of the occasions. One time she did make the comment that, you know, that would be crazy. And I said, yes, but I'm crazy for you. And then she just smiled at me, and that was it."

Defendant stated that this kind of conduct occurred between them for about a year prior to the week of October 6, 2001. N.C. never told him that she was not interested in him. Defendant also testified that the

way N.C. dressed was "not necessarily arousing" but he considered it "as possibly coming on to me" or creating a "coming-on mood."

Defendant further testified that he put the edible underwear in N.C.'s mailbox on a Sunday and called N.C. that night and told her he had left something for her. When he called her Monday morning, she said that "she better get it out of there because she didn't want the mailman to think that she left them in there for him." He sent N.C. the edible underwear "just to get her reaction from previous conversations that [they] had" about "sexual advances." After that incident, N.C. did not exhibit any fear of defendant or have an out-of-the-ordinary reaction to him.

On Thursday, October 11, 2001, defendant and N.C. went to Wal-Mart to buy a computer table. While they were putting the desk together, defendant "told her that I was going to come by Friday night, and we would go late-night dancing at the new club after she got off work." When asked what her response was, defendant testified, "Only thing she said is, we are?"

On Friday, October 12, 2001, defendant went home after work and showered. Around 5 or 5:30 p.m., he went to Jim's bar, where he met his friend, Gene Johnson. About an hour later, Johnson and defendant left Jim's and dropped defendant's car off at his home. Then they took Johnson's car to the Elk's Lodge. They had a few beers and left between 9:30 and 10 p.m. Johnson dropped off defendant at home.

Around 11 p.m., defendant left his home to go by N.C.'s and see if she was home from work. When he got to her house, he did not see her car and proceeded to the "Sixth and J Tavern." He stayed at the tavern, drinking beer, until it closed at 1 a.m. He then drove to Backwaters' parking lot and looked for N.C.'s car, but he did not find it. He drove back to N.C.'s house and saw that her car was there.

Defendant walked up to the front door and found it unlocked. He was not surprised by this, because he thought N.C. knew he was going to come by. He knocked on the door and then went into the house. Once inside, he said, "[N.C.], are you home?" but did not hear any reply. The lights were off, although some light was coming from Gabriel's room. He was not expecting Gabriel to be there, but did not think it was strange that light was coming from his room because Gabriel's night-lights were often left on all the time. Defendant then knocked on N.C.'s bedroom door, opened it, and entered the room. There was no reply from N.C. to his knock. He believed they had prearranged to meet there. He walked toward the bed and said, "Are you in here, [N.C.]?" He then reached down and felt her on the bed. He shook her a little bit and said, "Are you ready for me, [N.C.]?" N.C. did not respond. Defendant pulled the covers away from the pillow that was

between N.C.'s legs, and said, "[N.C.], we're going to have to remove this pillow first." Then he grabbed her right knee, and started to push it up to pull the pillow out from between her legs. When he did that, her left leg also moved, and he removed the pillow. He bent over and kissed the inside of her left thigh and then raised up and said, "Are you ready for me? Are you ready for me now, [N.C.]?" She replied, "Yes, that feels good." Then he put his hand between her legs and rubbed her vagina. Then he bent over and kissed the inside of her leg again and started moving his way up between her legs. He continued rubbing her vaginal area, and N.C. started "humping" his hand. He put his head under the covers and started to kiss her belly. He then felt her hand on his shoulder, pushing him down toward her vagina. He resisted, and she put her hand on his head and said, "More. That feels good." He then put his finger inside N.C.'s vagina. After she put her hand on his head, she suddenly moved away and said, "Just go home," in a regular tone of voice. Defendant was "kind of startled" and sat on the side of the bed. He said, "What's wrong, [N.C.]?," and N.C. said, "Just please leave." He said, "I don't understand. You told me to go ahead." She said "Just please go home." Defendant left the bedroom and shut the door. He then left the house, but returned within 5 or 10 minutes because he wanted to talk to N.C. to see what the problem was. Defendant went back into the bedroom where there were still no lights on and pulled the covers back. He said, "[N.C.], can we talk about this?" N.C. then got out of the bed with the covers wrapped around her and told defendant to "get the fuck out." Defendant testified that he "told her I was sorry. I was drunk. I was sorry, but she told me to do it. Then I left."

Defendant further testified that at the time, he did not know that there was anything criminally wrong with what he was doing. He did not believe that he did anything to which N.C. did not consent. He estimated that he was at N.C.'s house between 1:30 and 1:45 a.m. on October 13, 2001. Defendant acknowledged that he had developed a sexual attraction to N.C.

Defendant also testified that he had only had three or four hours of sleep before Vanderbol questioned him. Defendant did not recall telling Vanderbol that N.C. "woke up" after he kissed her vagina. Defendant acknowledged that during the interview, he initially told Vanderbol that he did not return to the bedroom the second time. Later during the interview, he told Vanderbol that he went back to apologize. He also acknowledged that he did not tell Vanderbol that (1) he had made arrangements with N.C. to go dancing on Friday night; (2) he had sent her edible underwear; (3) she had said, "Yes, that feels good"; (4) she started humping his hand and pushed on his shoulder;

(5) that she responded, "More, that feels good"; and (6) he went back into the bedroom to find out why N.C. had changed her mind about him. He further acknowledged that he did not tell Vanderbol that when he went back into the bedroom, he told N.C., "You told me to do it." When asked why he did not tell Vanderbol that (1) he felt this was consensual and planned, (2) his relationship with N.C. had been growing, and (3) he felt he did nothing wrong, defendant responded that Vanderbol did not ask him that question. Defendant also acknowledged saying, "She's really pretty, isn't she?"

Susan testified that she received a call from N.C. around 4:30 a.m. on October 13, 2001. At first N.C. was whispering, but then she started crying and Susan could not understand what she was saying. The call lasted about 30 seconds. She heard N.C. say, "Dick came in my room." Susan left work immediately and went to N.C.'s house, which was only 5 to 10 minutes away. When she knocked on the front door, which was locked, N.C. let her in. N.C. was shaking and crying. Susan attempted to embrace her, but N.C. put her hands up, pushed Susan away, and backed up against a wall. At this point, she was crying loudly. After a few minutes, N.C. was able to talk to Susan. After their conversation, Susan called their cousin, Chad, who is close to both Susan and N.C., and asked him to come over. Then she called the police.

Tony testified that during fall 2001, he returned to Quincy on many weekends. When he arrived in the early morning hours, he stayed at N.C.'s house. He explained that he worked at a liquor store and on busy nights his shift did not end until 1 a.m. The work schedule was posted on Fridays. Sometime after he got the work schedule on Friday, October 12, 2001, he told N.C. he was working Saturday night, October 13.

Diane testified that when she visited N.C.'s house, the front door was unlocked. She acknowledged that she never went to N.C.'s house at 4 a.m.

On this evidence, the jury convicted defendant of criminal sexual assault (720 ILCS 5/12—13(a)(2) (West 2000)), and the trial court later sentenced him as stated. This appeal followed.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Defendant first argues that the State failed to prove him guilty of criminal sexual assault beyond a reasonable doubt. Specifically, he contends that the State failed to show that he knew that N.C. was unable to give consent. We disagree.

■ In reviewing a claim that the evidence was insufficient to support a defendant's conviction, "the question is whether any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt, viewing the evidence in the light most favorable to the State." *People v. Ortiz*, 196 Ill. 2d 236, 259, 752 N.E.2d 410, 425 (2001). In making that assessment, this court will not substitute its judgment for that of the trier of fact with regard to the weight of the evidence and the credibility of witnesses. *People v. Kotlarz*, 193 Ill. 2d 272, 298, 738 N.E.2d 906, 919 (2000). Despite our deference to the trier of fact, we will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Ortiz*, 196 Ill. 2d at 259, 752 N.E.2d at 425.

■ Under section 12—13 of the Criminal Code of 1961 (Code), a person commits criminal sexual assault when he "commits an act of sexual penetration and the accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent." 720 ILCS 5/12—13(a)(2) (West 2000).

Section 4—5 of the Code defines knowledge, in pertinent part, as follows:

> "A person knows, or acts knowingly or with knowledge of:
>
> (a) The nature or attendant circumstances of his conduct, described by the statute defining the offense, when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists." 720 ILCS 5/4—5 (West 2000).

"The knowledge element of a crime rarely can be proved by direct evidence" (*People v. Marcotte*, 337 Ill. App. 3d 798, 804, 787 N.E.2d 369, 375 (2003), citing *People v. Sanchez*, 292 Ill. App. 3d 763, 771, 686 N.E.2d 367, 373 (1997)), and thus is ordinarily proved circumstantially (*Ortiz*, 196 Ill. 2d at 260, 752 N.E.2d at 425).

■ In this case, the following evidence supports the jury's finding that defendant knew that N.C. was asleep and thus unable to give knowing consent to the acts of sexual penetration that defendant engaged in with N.C.: (1) when defendant entered the house, the lights were off; (2) when he called N.C.'s name, she did not respond; (3) N.C.'s bedroom was dark, and defendant saw that she was in bed; (4) N.C. did not respond when defendant called her name upon entering the bedroom; (5) N.C. did not respond when defendant shook her and asked her if she was ready for him; (6) N.C. did not respond when defendant moved her leg and moved the pillow that was between her legs; (7) N.C. testified that she was asleep and awakened by the feeling of someone's fingers inside her vagina and one of her legs being pushed; and (8) defendant told Vanderbol that N.C. "woke up" after

he kissed her vagina. We hold that the jury was entitled to conclude from this evidence that defendant knew that N.C. was asleep (or, at the very least, that it was substantially probable that she was) when he engaged in the acts of sexual penetration. Accordingly, we further hold that the State proved defendant guilty beyond a reasonable doubt.

In so holding, we strongly reject defendant's contention that N.C.'s alleged failure to discourage his sexual interest in her somehow constituted consent for him to commit a sexual act upon her while she was asleep. No evidence showed that N.C. had agreed to a sexual rendezvous at her home that night. Moreover, defendant's "she-asked-for-it" defense harkens back to an era we have long since passed in which the victim was put on trial.

## B. Testimony Regarding Defendant's Request for an Attorney and Refusal To Make a Tape-Recorded Statement

Defendant next argues that he was denied a fair trial when the trial court allowed testimony that after he waived his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)) and was interviewed by Vanderbol, he invoked his right to counsel and refused to make a tape-recorded statement. We disagree.

### 1. *Background*

Prior to trial and before a different judge (Judge Dennis Cashman), the State filed a motion *in limine*, seeking to admit evidence that defendant had refused Vanderbol's request to make a tape-recorded statement. The trial court denied the State's motion; however, in doing so the court indicated that the State would be allowed to present such evidence if defendant challenged Vanderbol's testimony at trial.

At trial, during the State's cross-examination of defendant, the following colloquy occurred:

"Q. After Investigator Vanderbol walked you through what had occurred in that bedroom in [N.C.'s] home, you made some comments to him about how you felt about this, didn't you[?]

A. I'm not sure of the question.

Q. Well, let me put it to you this way. In fact, one of the things you said to Investigator Vanderbol was that the whole incident was very stupid and that you should not have done that.

A. I did make that statement, yes."

Shortly thereafter, during redirect examination, defense counsel asked the following questions and received the following answers from defendant:

"Q. *** [D]id [Vanderbol], during this 30-minute interview, did [he] ever bring up any panties or anything like that?

A. The—Officer Vanderbol, when he questioned me, told me what I did.

Q. And so when [the prosecutor], on his question to you, said when [Vanderbol], and I quote, walked you through this interview, that's exactly what he did.

A. That's correct.

Q. And you answered the questions that he asked of you; is that right?

A. Yes.

Q. And then the interview was terminated?

A. That's correct.

Q. You're not claiming you weren't read your rights, are you?

A. No, I was read my rights.

Q. And, as far as [Vanderbol] was concerned, at the time of the interrogation, did [Vanderbol] ask you if you remembered everything that happened?

A. Yes, he did.

Q. And did you tell him you remembered everything that happened?

A. No, I didn't.

Q. You told him—what did you tell him?

A. At that time I was unclear and unsure of everything.

Q. Why was that?

A. Because [Vanderbol] was just—he was directing me in questioning me and telling me what I had done. He didn't ask me if I had done it. He told me this is what I had done."

The prosecutor then requested a conference outside the jury's presence. The court granted that request, and the prosecutor renewed his motion to allow evidence that defendant had declined to make a recorded statement for police. The prosecutor argued that defendant "opened the door" by implying on redirect that Vanderbol put words in his mouth. The following excerpt of the prosecutor's argument fairly summarizes his position:

"[F]rom experience I can tell you, Judge, here's what commonly happens: We get a note back from the jury. Okay. And that note is, is there any videotape? Is there any audiotape of this interview? Because [defense counsel], I guarantee you, would, should, and will get up and dispute the credibility of Investigator Vanderbol relative to his client about what was said in that interview. And I simply am entitled to have that jury not assume or speculate that the reason it wasn't taped is because we didn't want it taped. The cure to the problem is this: To instruct the jury that the defendant's invocation of his constitutional right is appropriate and the police cannot continue to question him. You are not to consider that in any way in this case."

Defense counsel argued that the evidence would make it appear that defendant invoked his right to counsel because he had something to hide.

The trial court granted the State's motion and stated, in pertinent part, as follows:

"I have read thoroughly Judge Cashman's, the transcript of Judge Cashman's ruling. First off, I don't have any qualms or quibble with Judge Cashman's *** ruling. I believe that I would have ruled in the same circumstance. Yet in the same respect, Judge Cashman also admonished in as strong a term as possible, and as I recall, at least twice and possibly three times during that ruling, that if the door was opened by the defense, that if there was any inquiry in this process, then the State would be allowed to go into this and correctly so. Certainly, the State cannot lever the door open, if you will. The term, the phrase used, and I'm going to assume that it was used by [the prosecutor] in his [c]ross-[e]xamination, 'walk you through,' was used in a totally and completely different context than it was used by [defense counsel] in his [r]edirect. In using that term, I believe that the door was opened and that, as discussed here, the State should be—should be allowed to inquire."

Back in the courtroom, the following colloquy then occurred between the prosecutor and defendant during re-cross-examination:

"Q. After you had discussed the event you have already referred to with [Vanderbol], he asked you if you would consent to having that interview taped, didn't he?

A. Yes.

Q. And, in fact, you told him you would agree to have that interview taped, correct?

A. Yes.

Q. And at that point in time, you asked [Vanderbol] whether or not you were going to be placed under arrest, correct?

A. That is correct.

Q. In fact, at that point in time he told you that you were going to be placed under arrest, correct?

A. Yes.

Q. Then, at that point, you told him that you wanted to talk with a lawyer, correct?

A. Yes.

Q. And, at that point in time, all questioning, all discussions with [Vanderbol], stopped, correct?

A. That is correct."

The trial court then admonished the jury to draw no inference adverse to defendant by virtue of his having exercised his right to speak to an attorney.

## 2. *Analysis*

We reject defendant's contention that he was deprived of a fair trial as a result of the above-quoted colloquy between the prosecutor and him.

 A trial court has discretion to decide whether evidence is relevant, and we will not reverse that decision absent a clear abuse of discretion that results in prejudice to defendant. *People v. Green*, 339 Ill. App. 3d 443, 454, 791 N.E.2d 134, 143 (2003). The trial court may reject evidence on grounds of irrelevancy if the evidence has little probative value due to its remoteness or uncertainty, or if its probative value is outweighed by its possibly unfair prejudicial nature. *People v. Caffey*, 205 Ill. 2d 52, 114-15, 792 N.E.2d 1163, 1202 (2001).

 Defendant correctly asserts that under *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), the due process clause of the fourteenth amendment prohibits impeachment of a testifying defendant based on the defendant's silence following *Miranda* warnings. *Anderson v. Charles*, 447 U.S. 404, 407, 65 L. Ed. 2d 222, 225-26, 100 S. Ct. 2180, 2181-82 (1980); see also *Edwards v. Arizona*, 451 U.S. 477, 487, 68 L. Ed. 2d 378, 388, 101 S. Ct. 1880, 1886 (1981) (holding that any statements a defendant makes to police after invoking his right to counsel but before he has had access to counsel are not admissible at trial). The *Doyle* rule, however, is not without exceptions. For example, *Doyle* does not bar cross-examination relating to a defendant's prior inconsistent statements. *Anderson*, 447 U.S. at 408, 65 L. Ed. 2d at 226, 100 S. Ct. at 2182. "Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson*, 447 U.S. at 408, 65 L. Ed. 2d at 226, 100 S. Ct. at 2182. Thus, evidence that would ordinarily be inadmissible in the interest of affording a defendant constitutional protections can become admissible as a result of the defendant's conduct. The Supreme Court in *Jenkins v. Anderson*, 447 U.S. 231, 238, 65 L. Ed. 2d 86, 94, 100 S. Ct. 2124, 2129 (1980), further discussed that exception to *Doyle* as follows:

> "In determining whether a constitutional right has been burdened impermissibly, it also is appropriate to consider the legitimacy of the challenged governmental practice. [Citation.] Attempted impeachment on cross-examination of a defendant, the practice at issue here, may enhance the reliability of the criminal process. Use of such impeachment on cross-examination allows prosecutors to test the credibility of witnesses by asking them to explain prior inconsistent statements and acts. A defendant may decide not to

take the witness stand because of the risk of cross-examination. But this is a choice of litigation tactics. Once a defendant decides to testify, '[t]he interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.' [Citation.]

Thus, impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial."

In *Harris v. New York*, 401 U.S. 222, 226, 28 L. Ed. 2d 1, 5, 91 S. Ct. 643, 646 (1971), the Court held that a statement taken in violation of *Miranda* may be used to impeach a defendant's credibility. In concluding that such impeachment did not violate the fifth amendment, the Court wrote as follows:

"Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. [Citations.] Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process." *Harris*, 401 U.S. at 225, 28 L. Ed. 2d at 4, 91 S. Ct. at 645-46.

We conclude that in this case, the challenged governmental process was legitimate and did not impermissibly burden defendant's constitutional right to remain silent. In the State's case in chief, it was not permitted to use the evidence that defendant invoked his right to counsel, and its use of that evidence upon re-cross-examination of defendant was not to show defendant's guilt. Instead, the State sought to counter defendant's attempt to cast his interview with Vanderbol in what the State—and the trial court—considered to be a false light. If the State had not been permitted to show that defendant had declined the opportunity to make a recorded statement, defendant could have suggested in closing argument—and the jury might have concluded— that Vanderbol's interviewing techniques were coercive. The jury would thus have been left with a false impression of Vanderbol's interviewing tactics. The State's effort to present the truth to the jury of the interaction between defendant and Vanderbol was, in the particular circumstances of this case, a legitimate goal consistent with the truth-seeking process of trial.

Defendant nonetheless contends that the evidence that he declined to make a recorded statement *after* he submitted to questioning is not probative of what occurred in the interview that had just concluded. We disagree. If the jury (1) believed defendant's claim that Vanderbol had put words in his mouth in the first interview, and (2) did not

know that defendant had been offered the opportunity to set the record straight by making a recorded statement of his version of events, the jury would likely give more credence to defendant's trial testimony and less to Vanderbol's. On the other hand, the evidence that Vanderbol had offered defendant the opportunity to put his statement on tape shows that Vanderbol was willing to allow defendant's words to speak for themselves on the record, thus diminishing any suspicion that Vanderbol had attempted to unfairly characterize defendant's statements.

■ In light of the need to balance defendant's privilege against self-incrimination against the legitimate truth-seeking function of the trial process, we conclude that the trial court did not abuse its discretion by admitting the evidence that by invoking his right to counsel, defendant gave up the opportunity to make a recorded statement. In so holding, we recognize that any reference at trial to a defendant's invoking his right to counsel risks endangering his right against self-incrimination. We thus emphasize that our holding is limited to the circumstances of this unique case—namely, that (1) defendant opened the door to this evidence after having been cautioned in advance by the trial court; (2) defendant's declining to make a recorded statement was inextricably linked to his request for counsel; (3) the trial court carefully considered the issues and minimized the prejudicial effect of the evidence by admonishing the jury; and (4) the State did not refer to the evidence again at any point in the proceedings.

### C. The Prosecutor's Remarks During Closing Argument

Defendant next argues that he was denied a fair trial when the prosecutor referred to him as a "predator" during closing argument. Specifically, he contends that the prosecutor drew an unjustified inference from the evidence when he made the following remarks:

"I think that it's important that we understand, that we think about the kind of predator who, in this situation we're dealing with, it's important for us to understand how predators like this select their victims. Now, their tools, their weapons, their weapons of choice are not guns or knives or axes. They are trust, and they are position. They get close to their victims by disarming them. They compromise them. And the way they do that is through that trust and through their position, good deeds, family relationships, until they're in position to do what they want or think that they can. Now, people like [N.C.] often times suffer in silence because they know instinctively that there are no good options in situations like this. There are only bad and worse choices. And don't think for a moment that predators like this don't understand that."

■ Because defendant failed to object to the prosecutor's remarks

at trial, he did not properly preserve this issue for review. *People v. Williams*, 193 Ill. 2d 1, 26, 737 N.E.2d 230, 245 (2000). Thus, defendant has forfeited this issue on appeal unless the plain error rule applies. Errors not properly preserved for review may be reviewed as plain errors if the evidence is closely balanced or the error is of such magnitude that the defendant has been denied a fair trial. *People v. Graham*, 206 Ill. 2d 465, 475, 795 N.E.2d 231, 238 (2003); see 134 Ill. 2d R. 615(a). Not only do we conclude the record shows no plain error, we conclude that the prosecutor's comments were not error at all. See *Williams*, 193 Ill. 2d at 27, 737 N.E.2d at 245 ("Before invoking the plain error exception, however, 'it is appropriate to determine whether error occurred at all.' *People v. Wade*, 131 Ill. 2d 370, 376[, 546 N.E.2d 553, 555] (1989)").

■ Prosecutors are afforded wide latitude in closing argument. A prosecutor may comment on the evidence and draw all legitimate inferences deducible therefrom, even if they are unfavorable to the defendant. *People v. Simms*, 192 Ill. 2d 348, 396, 736 N.E.2d 1092, 1124 (2000); *People v. Toney*, 337 Ill. App. 3d 122, 147, 785 N.E.2d 138, 159 (2003). In reviewing a challenge to remarks made by the prosecutor during closing argument, the comments must be considered in the context of the parties' closing arguments as a whole. Moreover, the reviewing court must indulge in every reasonable presumption that the trial court properly exercised its discretion in determining the propriety of the remarks. *Simms*, 192 Ill. 2d at 397, 736 N.E.2d at 1125.

■ We agree with the State that when viewed in context, the prosecutor's remarks fell within the bounds of proper argument. As the State notes, the prosecutor used the term "predator" "in the context of explaining that individuals *** who commit these types of crimes are often able to do so because they establish a trust with the victim by their relationship to the victim and by doing good deeds." The evidence showed that (1) defendant was the grandfather of N.C.'s son, Gabriel; (2) although N.C. and defendant's son were no longer romantically involved, defendant and Diane maintained a relationship with both N.C. and Gabriel, and defendant stated that he had a "family relationship" with N.C.; (3) during several years leading up to the incident, defendant had developed a sexual attraction to N.C., whom he treated as a family member; (4) defendant stopped by N.C.'s residence frequently to help her with household repairs; (5) two days prior to the incident, defendant went with N.C. to Wal-Mart to buy a computer table; and (6) when defendant entered N.C.'s residence during the early morning hours of October 13, 2001, he intended to have a sexual encounter with her. Given the leeway that a prosecutor is af-

forded in making closing argument, we conclude that the prosecutor's remarks about defendant being a "predator" constituted a reasonable inference based on the evidence presented. The prosecutor was thus allowed to not only draw that inference but to argue it to the jury.

### D. The Trial Court's Failure To Properly Admonish Defendant Under Supreme Court Rule 605(a)

Last, defendant argues that the trial court failed to properly admonish him regarding his appeal rights, pursuant to Supreme Court Rule 605(a) (210 Ill. 2d R. 605(a)). Defendant thus requests that we remand with instructions that the court properly admonish him and allow him to file a postsentencing motion. The State concedes that we should remand, and we accept the State's concession.

Supreme Court Rule 605(a) provides that when a defendant has been found guilty and sentenced after pleading not guilty, the trial court shall admonish the defendant regarding his appeal rights. 210 Ill. 2d R. 605(a). Specifically, the rule provides, in pertinent part, that after imposing sentence, the trial court "shall" advise the defendant of the following:

> "[(1)] that prior to taking an appeal, if the defendant seeks to challenge the correctness of the sentence, or any aspect of the sentencing hearing, the defendant must file in the trial court within 30 days of the date on which sentence is imposed a written motion asking to have the trial court reconsider the sentence imposed, or consider any challenges to the sentencing hearing, setting forth in the motion all issues or claims of error regarding the sentence imposed or the sentencing hearing;

> [(2)] that any issue or claim of error regarding the sentence imposed or any aspect of the sentencing hearing not raised in the written motion shall be deemed waived; and

> [(3)] that in order to preserve the right to appeal following the disposition of the motion to reconsider sentence, or any challenges regarding the sentencing hearing, the defendant must file a notice of appeal in the trial court within 30 days from the entry of the order disposing of the defendant's motion to reconsider sentence or order disposing of any challenges to the sentencing hearing." 210 Ill. 2d R. 605(a)(3).

The supreme court's rules are not mere technicalities or suggestions. As the supreme court wrote in *Bright v. Dicke*, 166 Ill. 2d 204, 210, 652 N.E.2d 275, 278 (1995), "[t]he rules of court we have promulgated are not aspirational. They are not suggestions. They have the force of law ***." Thus, trial courts must strictly comply with the admonition requirements of Supreme Court Rule 605. See *People v. Jamison*, 181 Ill. 2d 24, 30, 690 N.E.2d 995, 998 (1998); but

*cf. People v. Williams*, 344 Ill. App. 3d 334, 338, 800 N.E.2d 168, 172-73 (2003) (concluding that the trial court's failure to strictly comply with Rule 605(a) did not require remand under the particular circumstances of that case, in which the defendant did not challenge his sentence on appeal). Because this issue involves the trial court's compliance with a supreme court rule, our review is *de novo. People v. Lloyd*, 338 Ill. App. 3d 379, 384, 788 N.E.2d 1169, 1173 (2003).

■ The record shows that after sentencing defendant, the trial court admonished him that he had a right to appeal. However, the court failed to admonish defendant as to the requirements necessary to preserve the right to appeal his sentence or any aspect of the sentencing hearing. In particular, the court failed to admonish him that (1) to challenge his sentence or any aspect of the sentencing hearing, he must file in the trial court a motion to reconsider sentence or "consider any challenges to the sentencing hearing"; and (2) the filing of a postsentencing motion within 30 days of being sentenced was necessary to preserve any sentencing issues for appellate review. Because the court failed to properly admonish defendant in accordance with Rule 605(a), we agree with the parties that we should remand with instructions that the court (1) properly admonish defendant, and (2) allow him to file a motion to reconsider his sentence or "consider any challenges to the sentencing hearing." By remanding this case, the trial court will have the first opportunity to review defendant's claims of sentencing error (including the excessiveness of his seven-year sentence and the propriety of the restitution order) and, if warranted, correct those errors. See *People v. Reed*, 177 Ill. 2d 389, 394, 686 N.E.2d 584, 586 (1997) (a postsentencing motion allows "the trial court the opportunity to review a defendant's contention of sentencing error and save the delay and expense inherent in appeal if they are meritorious"); see also *People v. Rathbone*, 345 Ill. App. 3d 305, 308-10 (2003), (in which this court recently discussed the importance of the trial court's having the first opportunity to address a defendant's sentencing claims).

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment and remand with directions.

Affirmed and remanded with directions.

KNECHT, P.J., and MYERSCOUGH, J., concur.