NO. 4-05-0151     Filed 6/21/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| MARTEL MONTGOMERY, | ) | No. 04CF328 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Patrick W. Kelley, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In September 2004, a jury convicted defendant, Martel Montgomery, of armed robbery (720 ILCS 5/18-2(a) (West 2004)), conspiracy to commit armed robbery (720 ILCS 5/8-2(a) (West 2004)), aggravated discharge of a firearm (720 ILCS 5/24-1.2 (West 2004)), and home invasion (720 ILCS 5/12-11(a)(3) (West 2004)). At defendant's December 2004 sentencing hearing, the trial court determined that defendant's conviction for conspiracy (count II) merged into his conviction for armed robbery (count I) and then sentenced defendant to 21 years in prison for home invasion, 6 years in prison for armed robbery, and 4 years in prison for aggravated discharge of a firearm. The court also found that great bodily harm and severe bodily injury occurred and, accordingly, ordered that (1) defendant's sentences were to be served consecutively and (2) he was required to serve 85% of

each sentence.

Defendant appeals, arguing that (1) he was denied his constitutional right to retain counsel of his choice; (2) his trial counsel was ineffective because he failed to inform defendant of the potential punishment for the crimes with which he was charged; (3) the prosecutor's closing argument was improper; (4) the trial court erred by failing to conduct an appropriate examination of his posttrial allegations of ineffective assistance of counsel; (5) the court erred when it determined that defendant's conduct caused great bodily harm and severe bodily injury; and (6) assuming that the truth-in-sentencing statute applies, the court erred when it ordered defendant to serve 85% of all three of his sentences. We disagree with each of defendant's arguments and affirm.

## I. BACKGROUND

Because defendant does not challenge the sufficiency of the State's evidence to support his convictions, we will discuss it only to the extent necessary to put his arguments in context.

The evidence at defendant's September 2004 jury trial showed that defendant, Demario Danley, and his brother, Don Danley, agreed to rob Nicholas Griffitts at Griffitts' trailer. Don had previously bought marijuana from Griffitts at the trailer. On March 19, 2004, defendant and the Danley brothers went to Griffitts' trailer, and Griffitts let them in after Don

said they were there to buy marijuana. Griffitts' friend, Sam Grant, was also present. Once inside, they discussed a marijuana purchase. During the discussion, Adrian Brown came to the trailer to purchase some marijuana.

As the negotiations continued in the trailer's family room, defendant got up, walked down a hallway, and then walked back into the family room with a revolver in his hand. He struck Griffitts on the head with the gun, knocking him to the floor. Defendant then demanded of him, "Where is your stuff? Where is your money?" When Griffitts did not respond, defendant repeatedly kicked him.

When Griffitts got to his feet, defendant pointed the gun at him and fired two shots past his head into the trailer wall. As he did so, defendant yelled, "Where is the money? Where is the stuff? I know you got it." Defendant then fired a third shot into the trailer wall.

At that point, Grant, who was lying on the floor in the family room, told defendant where to find some hidden money. Demario then located a money box, and defendant grabbed a bag of marijuana off the table. The Danley brothers and defendant then began leaving. On his way out, defendant said, "Don't think of following me," and fired a fourth shot, this time into Griffitts' television.

Shortly after defendant and the Danley brothers fled

the trailer, the police and paramedics were called to the scene. An officer described Griffitts as having a "large cut or gash to his head" that was bleeding. Griffitts also appeared "a little disoriented."

The officer also testified that approximately 10 to 15 minutes after he was dispatched to Griffitts' trailer, the phone in the trailer rang. The officer answered the phone and identified himself. The caller stated that his name was Don and although he had been at the trailer earlier that night, he was not involved in what happened. The caller claimed he did not know what was going on and did not want to get his friends involved.

The officer later went to the hospital to speak with Griffitts, who informed him that the caller was probably Don Danley, who lived in a nearby apartment complex. The police went to that location, found Don, and a short time later he gave a full statement to the police, which implicated himself, Demario, and defendant.

Griffitts testified that after defendant struck him in the head, defendant tried to rip Griffitts' pants off to see if he had anything in his underwear. While doing that, defendant kicked him repeatedly, trying to kick Griffitts in the chest and face. Most of Griffitts' injuries were to his forearms because he had tried to block defendant's kicks. Defendant kept asking

- 4 -

where the money and the rest of the drugs were, but Griffitts said nothing. Griffitts estimated that the first two shots defendant fired missed him by five or six inches, while defendant's last shot missed him by three or four inches.

Griffitts further testified that he received 13 staples in his head and one stitch in his lip. (However, the prosecutor later conceded that Griffitts' medical records showed he received only seven staples in his head.) Griffitts explained that these injuries gave him a headache every day for two weeks, and his vision was blurry "until right before I got staples in my head at the hospital."

Don testified as a State's witness and identified defendant as Demario's closest friend. Don explained that he did not have any agreement with the State regarding his testifying, but he hoped that his sentence would be reduced as a result. Nonetheless, he stated that he was "only here to tell the truth." He acknowledged that he had been told that if he was "honest, [he would] receive a benefit," but he did not know what the benefit would be.

Don described the plan that he, Demario, and defendant made to rob Griffitts. On March 19, 2004, he asked his "side girlfriend," Tressa Walsh, to watch his two-year-old daughter so that he and the others could "go rob Nick."

Walsh, Don, and Don's daughter then drove to pick up

Demario and defendant. Defendant's girlfriend, Marqueesha Davis, also joined them. Demario and defendant had the gun. They all drove back to Don's apartment and discussed their plan to rob Griffitts. Don's involvement was necessary because Griffitts did not know either Demario or defendant and would not have let them in his trailer. Don then described the events inside the trailer in detail, substantially corroborating Griffitts' testimony.

After the robbery was over, they went back to Don's apartment and split up the proceeds--namely, the marijuana and the money. Don then went to his cousin's house with Walsh, where he smoked some marijuana in an effort to calm himself down. He was worried about the police because Griffitts knew him. He called Griffitts and spoke to a police officer who answered.

Don then took Walsh home and went back to his apartment. When the police came, Don let them in, told them he knew why they were there, and agreed to an interview, in which he told the police what had happened. At the time he did so, he had not spoken to any prosecutors, nor had the police made any promises of any kind as to what would happen to him.

Walsh substantially corroborated Don's testimony. She also testified that before Don, Demario, and defendant went to Griffitts' trailer to rob him, she saw the gun in defendant's hand. She also heard the three of them talking about how they were going to commit the armed robbery. After the robbery, Walsh

heard defendant say that he had to hit "this guy *** in the head with the pistol because he wouldn't give his money up."  She also saw them split up the proceeds from the robbery.

Davis testified that she was then in custody because, despite being subpoenaed, she did not come to court.  Davis testified about conversations she heard on March 19, 2004, and a few days before that involving defendant, Don, and Demario, in which they talked about "this white dude with the weed."  Her testimony about the events on March 19, 2004, substantially corroborated Don's, except that she maintained that Don, Demario, and defendant all left Don's apartment together "to go buy some weed."  Davis also acknowledged that defendant was the father of her young child.

Davis also testified that when defendant and Don returned to Don's apartment, she thought something might be wrong, but she did not know for sure.  As she, Don, Demario, defendant, Don's baby, and Walsh all drove away from Don's apartment, she heard some conversation about "the white guy getting hit in the head and blood going everywhere."

The State's last witness was Deputy United States Marshal John Beeman, who assisted Springfield police in apprehending defendant in Fort Wayne, Indiana.  Beeman received information from Springfield authorities that defendant was traveling under the name of "Chris Brown" by Greyhound bus to

Fort Wayne with his girlfriend, Latoya Morris.  On March 27, 2004, Beeman and several other officers went to an address in Fort Wayne associated with Morris and found defendant hiding in the attic.

Defendant chose not to testify, and on this evidence, the jury convicted him of all charges.  The trial court later sentenced him as stated.  This appeal followed.

## II. ANALYSIS

### A. Defendant's Claim That He Was Denied His Constitutional Right To Retain Counsel of His Choice

Defendant first argues that the trial court denied him his constitutional right to retain counsel of his choice. Specifically, he contends that the trial court erred by denying his request to retain counsel of his choice without first (1) inquiring into the circumstances surrounding his request or (2) finding that his request was made for purposes of delay.  We disagree.

### 1. Background

During a recess from jury selection on the first day of defendant's trial, defendant addressed the trial court and the following colloquy occurred:

"[THE] COURT:  What can I do for you?

[DEFENDANT]:  Yes, sir--um--I believe I'd be better off that I should have a paid attorney in this case.  I don't feel that

[appointed counsel is] representing me to his best ability. I don't think he has my best interests at heart. I am facing a lot of time, and I just don't want to give my life away like that, man. I don't feel comfortable.

THE COURT: So what's your point?

[DEFENDANT]: If I could get some time to get a new lawyer?

THE COURT: No, [your current trial attorney] is appointed to represent you. He's an extremely able and competent counsel, and we have started jury selection. I'm not going to appoint a new lawyer for you, all right?

[DEFENDANT]: (Nodding head up and down)."

## 2. Analysis

In People v. Segoviano, 189 Ill. 2d 228, 245, 725 N.E.2d 1275, 1283 (2000), the supreme court addressed a defendant's argument that the trial court erred by denying his pretrial motion for a continuance to obtain substitute counsel and set forth the following guidelines for analysis of such claims:

"The determination whether to grant a contin-

uance for substitution of counsel is a matter left to the discretion of the trial court, and will not be overturned absent an abuse of that discretion.  [Citations.]  The factors to be considered in evaluating a trial court's exercise of its discretion include the diligence of the movant, the right of the defendant to a speedy, fair[,] and impartial trial, and the interests of justice. [Citations.]  However, it is well established that a trial court will not be found to have abused its discretion in denying a motion for substitution of counsel in the absence of ready and willing substitute counsel. [Citations.]"

Applying these principles to the facts before it, the Segoviano court rejected the defendant's claim and explained as follows:

"In this case, the motion did not even contain a representation that substitute counsel had been secured, much less an averment that such substitute counsel was ready and willing to enter an appearance in the case.  The trial court thus did not abuse its discretion

in denying the motion." Segoviano, 189 Ill. 2d at 245, 725 N.E.2d at 1283.

Defendant cites this court's decision in People v. Bingham, 364 Ill. App. 3d 642, 847 N.E.2d 903 (2006), for support of his argument that the trial court abused its discretion by failing to conduct sufficient inquiry into his request for a continuance to obtain new counsel. In Bingham, the defendant's public defender moved for a continuance on the day that the defendant's trial was set to begin. He told the court that the defendant had asked him to seek a continuance so that he could be represented by out-of-town counsel by the name of Earl Washington. Bingham, 364 Ill. App. 3d at 644, 847 N.E.2d at 906. The public defender further explained that Washington was already representing the defendant in other cases. Bingham, 364 Ill. App. 3d at 644, 847 N.E.2d at 906.

In response to the defendant's motion, the prosecutor conceded that the defendant had other cases pending in which he was being represented by Washington. The prosecutor further indicated that he had tried without success to contact Washington about those cases although he "'did get a palm message late yesterday afternoon from Mr. Washington.'" Bingham, 364 Ill. App. 3d at 644, 847 N.E.2d at 906. The trial court then ruled as follows: "'Given the representations I've heard, the motion to continue is denied.'" Bingham, 364 Ill. App. 3d at 644, 847

N.E.2d at 906.

This court concluded that the trial court's denial of the defendant's motion for a continuance to obtain substitute counsel constituted an abuse of discretion. In so concluding, we noted that "[t]he trial court should have conducted an inquiry into the circumstances and the purposes of the motion before making its ruling." Bingham, 364 Ill. App. 3d at 645, 847 N.E.2d at 907. We further noted that (1) the defendant identified a specific attorney whom he wished to hire if the court would grant a continuance; (2) the attorney was already representing the defendant on other, unrelated charges; (3) the prosecutor had been contacted by the attorney the day before trial was set to begin; (4) the case progressed quickly and had been pending only three months; and (5) no prior continuances had been granted.

Bingham should be understood as concluding, under the particular circumstances of that case, that an inquiry by the trial court might well have disclosed that the attorney the defendant identified by name (whose involvement in the case the prosecutor corroborated) would, in fact, be "ready and willing" substitute counsel. Segoviano, 189 Ill. 2d at 245, 725 N.E.2d at 1283. Bingham did not--indeed, could not--lower the bar set by the supreme court in Segoviano when it held that no abuse of discretion occurs when such a motion is denied in the absence of any representation that "substitute counsel had been secured."

<u>Segoviano</u>, 189 Ill. 2d at 245, 725 N.E.2d at 1283.

Defendant's reliance on <u>Bingham</u> is misplaced, given the pertinent factual distinctions between this case and <u>Bingham</u>. In this case, defendant did not identify an attorney whom he had contacted or with whom he had a prior existing relationship. Instead, the only thing the record shows is a vague hope by defendant that, if given a continuance, he could hire some attorney who might do a better job than his court-appointed counsel. In addition, this case had been pending for several months and the trial court had previously granted four continuances (two at defendant's request). Moreover, the record contains no indication that defendant had the financial resources to hire an attorney of his own choice.

We mention defendant's apparent lack of resources because his ability to hire private counsel would be essential in order for him to change counsel. That is, despite defendant's claimed dissatisfaction with his then-current court-appointed counsel, defendant had no right to pick and choose among counsel whom the court appoints to represent him. See <u>People v. Wanke</u>, 303 Ill. App. 3d 772, 782, 708 N.E.2d 833, 841 (1999) ("A criminal defendant has no right to choose his appointed counsel or insist on representation by a particular public defender"). This court reached the same conclusion in <u>People v. DeRossett</u>, 262 Ill. App. 3d 541, 544, 634 N.E.2d 1257, 1259 (1994) ("an indigent

- 13 -

defendant does not have the right to court-appointed counsel of his choice [citation], nor does a defendant have the right to select a particular assistant public defender to represent him").

Despite our conclusion, we nevertheless suggest that it is always better practice for the trial court--when questions involving a defendant's representation arise--to engage in a thorough inquiry, so that reviewing courts will not be forced to draw inferences from a sparse record. One good reason for a trial court to do so is that if a reviewing court were to conclude, as we did in Bingham, that the trial court abused its discretion by denying a motion for continuance to obtain substitute counsel, there is no such thing as "harmless error." In that regard, we reaffirm what we wrote in Bingham--namely, that a violation of a defendant's right to choice of counsel is not a "trial error" occurring during the presentation of the case that can be quantitatively assessed in light of the other evidence. Bingham, 364 Ill. App. 3d at 649, 847 N.E.2d at 910. "Instead, it is a fundamental constitutional error affecting a substantial right that defies harmless-error analysis." Bingham, 364 Ill. App. 3d at 649, 847 N.E.2d at 910; see also United States v. Gonzales-Lopez, ___ U.S. ___, ___, 165 L. Ed. 2d 409, 419, 126 S. Ct. 2557, 2563 (2006) (in which the United States Supreme Court affirmed the decision of the Eighth Circuit (United States v. Gonzalez-Lopez, 399 F.3d 924, 934 (8th Cir. 2005)), which Bingham

cited approvingly, writing, in part, that "[w]here the right to be assisted by counsel of one's choice is wrongly denied, *** it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a [s]ixth [a]mendment violation").

### B. Defendant's Claim That His Trial Counsel Was Ineffective for Failing To Correctly Inform Him of the Potential Punishment for the Crimes With Which He Was Charged

Defendant next argues that his trial counsel provided ineffective assistance when counsel informed defendant that the minimum sentence he could receive was 27 years in prison, not 31 years. We disagree.

Ineffective-assistance-of-counsel claims are reviewed under the standard set forth in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). People v. Evans, 186 Ill. 2d 83, 93, 708 N.E.2d 1158, 1163 (1999). "To obtain reversal under Strickland, a defendant must prove (1) his counsel's performance failed to meet an objective standard of competence and (2) counsel's deficient performance resulted in prejudice to the defendant." People v. Thompson, 359 Ill. App. 3d 947, 952, 835 N.E.2d 933, 937 (2005). To satisfy the deficient-performance prong, the defendant must show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the sixth amendment (U.S. Const., amend. VI). Thompson, 359 Ill. App. 3d at 952, 835 N.E.2d at 937. To satisfy the prejudice prong, the defendant must show that but for coun-

- 15 -

sel's errors, a reasonable probability exists that the outcome of the proceedings would have been different. <u>Thompson</u>, 359 Ill. App. 3d at 952, 835 N.E.2d at 937. The failure to satisfy either <u>Strickland</u> prong will preclude a finding of ineffective assistance of counsel. <u>People v. Young</u>, 347 Ill. App. 3d 909, 927, 807 N.E.2d 1125, 1140 (2004).

In <u>People v. Curry</u>, 178 Ill. 2d 509, 531, 687 N.E.2d 877, 888 (1997), the Supreme Court of Illinois held that "in order to establish prejudice [under <u>Strickland</u>'s second prong], defendant must demonstrate that there is a reasonable probability that, absent his attorney's deficient advice, he would have accepted the plea offer." See also <u>People v. Frieberg</u>, 305 Ill. App. 3d 840, 850, 713 N.E.2d 210, 218 (1999) (concluding that no actual prejudice was established where no evidence existed showing that the defendant would have accepted the State's plea offer, even if he had known the parameters of the applicable sentencing statutes).

In this case, nothing in the record suggests that defendant was prepared to plead guilty had he known that the minimum sentence was 31 years instead of 27 years in prison. Defendant has thus failed to establish prejudice under <u>Strickland</u>'s second prong.

### C. Defendant's Claim That the Prosecutor's Remarks During Closing Argument Were Improper

Defendant next argues that he was denied his right to a

fair trial when the prosecutor, during closing argument, (1) made improper comments regarding his failure to testify and defense tactics and (2) made "inflammatory statements not based on the evidence." We will address each contention in turn.

### 1. Prosecutor's Comments Generally

Prosecutors are afforded wide latitude in making closing remarks and may comment on the evidence and draw all legitimate inferences from the evidence, even if unfavorable to the defendant. People v. Taylor, 345 Ill. App. 3d 1064, 1081, 804 N.E.2d 116, 129 (2004). Reviewing courts must consider the closing argument as a whole, rather than focusing on selected phrases or remarks. People v. Perry, 224 Ill. 2d 312, 347, 864 N.E.2d 196, 218 (2007). Improper closing remarks require reversal only if they substantially prejudice a defendant, taking into account (1) the content and context of the comment, (2) its relationship to the evidence, and (3) its effect on the defendant's right to a fair and impartial trial. People v. Johnson, 208 Ill. 2d 53, 115, 803 N.E.2d 405, 440-41 (2003). In addition, our supreme court has stated that "[a] reviewing court will find reversible error only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." Perry, 224 Ill. 2d at 347, 864 N.E.2d at 218.

### 2. Defendant's Claim That the Prosecutor Improperly Commented on His Failure To Testify

During the prosecutor's initial closing argument, he reviewed in detail the evidence the State had presented and then stated the following:

"[PROSECUTOR:] So all of these pieces fit, ladies and gentlemen. All the evidence in the case points in absolutely one direction, and one direction only. All of the witnesses by themselves constitute overwhelming evidence of this defendant's guilt, and the question was he there or not, really I think we can answer pretty quickly, but the defendant's own actions are really, really telling of his consciousness of guilt, and that's the Deputy U.S. Marshall you heard from at the end of the case.

What explanation consistent with innocence exists for this man's behavior?

[DEFENSE ATTORNEY:] Judge, I'm going to object to that. My client doesn't have to explain anything. He has the presumption of innocence. He does not have to explain any of his actions, Judge, that's a shifting of the burden. I would object.

THE COURT: The objection is overruled

at this point.  The jury is allowed to draw inferences from your client's behavior."

Along this same line, defendant also complains of the following statement in the prosecutor's rebuttal closing argument:  "There is no evidence anywhere in this case that would explain an animosity or a bias to falsely put a case on [defendant].  It doesn't exist."

Defendant contends that these remarks "cross the line and were intended to point out that [defendant] did not testify." We disagree.

In People v. Keene, 169 Ill. 2d 1, 21, 660 N.E.2d 901, 911-12 (1995), the supreme court wrote the following:

> "The State may not 'point the finger of blame
> directly at the defendant for his failure to
> testify when it was within his power to en-
> lighten the jury.'  [Citation.]  Such 'prose-
> cutorial design' crosses the '"danger line"'
> marking the outer boundary of proper commen-
> tary.  [Citations.]  But short of that the
> State may comment that evidence is uncontra-
> dicted and may do so even if the defendant
> was the only person who could have provided
> contrary proof."

In this case, the prosecutor's comments clearly did not

constitute a comment on defendant's not testifying. The focus of these remarks was defendant's conduct and reasonable inferences the jury should draw from it, as the trial court ruled. These remarks contain no suggestion that somehow the defendant needed to explain anything.

Having so concluded, we nonetheless suggest that terms like "explanation," as used by the prosecutor in the above-quoted portion of his argument, not be used in a prosecutor's closing argument. A defendant is likely to object to their use at trial, on appeal, or both, and their use could prove problematic. In the heat of argument, when a prosecutor uses such a term, he or she might well inadvertently say something that would in fact constitute an impermissible comment on a defendant's refusal to testify. See, for example, People v. Herrett, 137 Ill. 2d 195, 213, 561 N.E.2d 1, 9 (1990) (concluding that the prosecutor "exceeded the bounds of fair comment when he referred to the failure of the defendant to explain his presence" at the crime scene because that comment referred to the defendant's failure to testify).

### 3. Defendant's Claim That the Prosecutor Improperly Commented Upon Defense Tactics

Defendant next contends that he was denied a fair trial when the prosecutor made the following comments in his rebuttal argument:

"How many times do we have to hear about

who is having sex with who, calling people

[']dope heads['] and calling people [']not

very bright['] before we understand what the

defense in this case is all about, smear

tactics and distractions, that's all that

was.  Personal attacks, trying to make you

not like witnesses, trying to get you to

disregard the facts of the case, and trying

to distract you from what you should be fo-

cused on, and what you should be focused on

is a simple question, what is the truth, what

are the facts, and what really happened in

this case.

* * *

Do not get distracted from your job,

which is to determine truth about who was

present there, ladies and gentlemen."

Specifically, he contends that Illinois courts have consistently

held that prosecutors are not allowed to claim that defense

counsel is attempting to free his client through trickery or

deception.  People v. Kidd, 147 Ill. 2d 510, 542, 591 N.E.2d 431,

446 (1992).  Defendant thus asserts that the prosecutor's rebut-

tal argument was similar to arguments the Supreme Court of

Illinois has condemned and that, because of this improper argu-

- 21 -

ment, he was denied his fundamental right to a fair trial.  We are far from persuaded.

These remarks were made in rebuttal in response to defense counsel's characterization of "every single one" of the State's witnesses as "dope heads."  Defense counsel also argued that Don and Walsh "spearheaded this whole case" against defendant and collaborated to pin it on him.  Regarding Don's testimony in particular, defense counsel argued the following:

"[L]et's see, how about taking your daughter to a robbery planning party, like he says he did, or how about sleeping with somebody's brother and then sleeping with him, or maybe use a girl's apartment to watch her kids while she goes to work to have sex with the father of that person's child?  Are you kidding me?"

Defense counsel then characterized Davis as upset and "clueless."  He added the following:  "She is not very bright, and I am sorry to say that, but she is not, but that is just a piece of a dopey, dopey, dopey, dopey, not so bright girl that they are using to convict my client."

As the State points out, a prosecutor may comment on defense characterizations of the evidence.  See People v. Jones, 156 Ill. 2d 225, 251-52, 620 N.E.2d 325, 336 (1993) (prosecutor's

rebuttal argument that the jury should not "'be fooled by the defense'" that insinuated beatings, among other things, "was a proper comment concerning defense characterizations of the evidence"). As earlier stated, the prosecutor's rebuttal argument must be considered in the context of the closing arguments as a whole. Thus, when defense counsel provokes a response, as here, defendant cannot complain that the prosecutor's reply denied him a fair trial. People v. Evans, 209 Ill. 2d 194, 225, 808 N.E.2d 939, 956 (2004).

Last, we acknowledge the State's argument that defendant has forfeited this contention because he failed to object at trial. We also note that defendant urges us to review the matter under the plain-error doctrine. Because we conclude that the complained-of argument constitutes no error at all, we need not do so.

### 4. Defendant's Claim That the Prosecutor Made Inflammatory Statements Not Based on the Evidence

Defendant next contends that he was denied a fair trial when the prosecutor made repeated statements that were not based on the evidence. Specifically, defendant complains of the prosecutor's statement that this was "a conspiracy case, because [defendant] was either the participant in a conspiracy to rob [Griffitts] or he was a victim of one of the most elaborate and unprobable [sic] conspiracies in the history of the criminal justice system." Defendant contends the prosecutor improperly

- 23 -

continued with this "grand conspiracy" theme when he argued as follows:

"[L]et us consider the witnesses, and let us consider the things really that would have to be true in order for this [d]efendant to be an innocent man, wrongly accused.

The first thing that would have to be true, [Don] would have had to come in here and commit one of the most egregious forms of perjury imaginable.

The second thing that would have to be true is that [Walsh] also came in here and committed one of the most egregious acts of perjury imaginable.

Third, [Grant], who identified the [d]efendant, had to have either been part of this grand conspiracy or been mistaken.

[Brown] would have had to have been part of this grand conspiracy or been mistaken, and it just so happened that [Grant] and [Brown] made the same mistake when they both positively identified the [d]efendant as the gunman, and then [Davis], a person who has no connection whatsoever to [Don] in the sense

that she is certainly no friend of Don's, she
is certainly no friend of [Walsh's], she is a
person that is closely and intimately related
to this [d]efendant, and what did she tell
you?  She corroborated what [Walsh] testified
to, that Don, Demario and [defendant] were
all three together before and all three to-
gether afterward.

For this man to be an innocent man,
wrongly accused, all of those things would
have had to have occurred."

The prosecutor concluded this theme by later arguing as
follows:

"[F]or [defendant] to be an innocent
man, wrongly accused, [Brown] would have
either had to have been part of some grand
conspiracy with [Don] or he just coinciden-
tally picked out the same guys that [Grant]
picked out, that Don and [Walsh] somehow are
manufacturing some kind of a grand conspiracy
against.  It is totally, totally implausi-
ble."

Defendant also contends that the prosecutor improperly
gave his personal opinion regarding Don's testimony, as follows:

"He got confused a couple of times, I would submit, but he was doing his very best to be honest." Finally, defendant contends that the prosecutor "even went so far as to inform the jury that a guilty verdict was 'morally right,'" when he stated the following:

"When you consider that testimony, when [Davis] is so actively trying to protect this man [(defendant)], there is only one conclusion that you can draw, there is only one conclusion that's supported by the evidence in this case, and that conclusion should drive your verdicts to the only just verdict in this case, the correct verdict in this case, the morally right verdict in this case, and that is a *** verdict of guilty on each of the counts.

Thank you." (Emphasis added.)

Specifically, defendant contends that the prosecutor's "grand conspiracy" theme exceeded the bounds of permissible argument because the Supreme Court of Illinois in People v. Williams, 181 Ill. 2d 297, 330, 692 N.E.2d 1109, 1126 (1998), held that a prosecutor must restrict his comments to the facts in evidence or reasonable inferences to be drawn therefrom. Regarding the "morally right verdict" comment, defendant contends that

- 26 -

the only effect of this argument was to arouse the prejudice and passion of the jury against him without shedding any light on the paramount question presented to the jury.

To slightly revise a common saying regarding campaigning for elective office, trying felony cases before a jury "ain't beanbag." These are serious matters with high stakes, and we expect advocates in our adversary system of justice to use all of their forensic skills to persuade the jury of the wisdom or justice of their respective positions. Certainly, defense counsel in this case vigorously attacked the State's case and the State's witnesses, and we should expect no less vigor from the prosecutor. Of course, counsel are not free in their closing arguments to say anything they might wish. Limitations exist, but there is no restriction on argument because a party takes offense to the harshness of the opponent's closing argument.

Not only do we disagree with defendant's claim that the prosecutor's argument was improper, but we deem that claim as potentially insulting to the jury. After all, one of the "common experiences in life" (see Illinois Pattern Jury Instructions, Criminal, No. 1.01 (4th ed. 2000)) that the members of the jury bring with them to the jury box is exposure to hortatory language on an all-too-frequent basis from politicians, salespeople, talk radio, television commercials, and others. We have difficulty believing that a jury composed of adults would somehow be in-

flamed by the prosecutor's hyperbole that the only just and "morally right verdict" was guilty on each of the counts. We consider it more likely that a juror who had not been otherwise persuaded might think to himself, "So you say, Bub."

In any event, we are disinclined to become the speech police and to impose unnecessary restrictions upon closing arguments in criminal cases. In our adversary system, we should let the lawyers "have at it," and the trial courts and reviewing courts should step in only when it can truly be said that comments during closing argument "were so prejudicial that real justice was denied or that the verdict resulted from the error." Perry, 224 Ill. 2d at 347, 864 N.E.2d at 218. Further, we view the "morally right verdict" comment as the prosecutor's hyperbole on the strength of the State's case, and nothing more. See People v. Cloutier, 178 Ill. 2d 141, 170-71, 687 N.E.2d 930, 943 (1997) (concluding that no error occurred when the prosecutor argued that the jury was "sworn" to uphold the law by finding the defendant eligible for the death penalty).

We also note that the prosecutor's remarks, which defendant on appeal argues were so egregiously improper, were not even objected to by his trial counsel, who, as the record shows, was no "shrinking violet." As we indicated earlier, we need not conduct a plain-error analysis regarding defendant's contentions concerning the prosecutor's closing argument because we conclude

that no error occurred.

Further, we reject defendant's contention that the prosecutor improperly gave his opinion regarding Don's testimony. The record shows that the prosecutor did not explicitly state his personal opinion that Don was a credible witness.  Instead, when read in context, the prosecutor's personal opinion referred only to Don's getting "confused a couple of times."  See People v. Pope, 284 Ill. App. 3d 695, 707, 672 N.E.2d 1321, 1329 (1996) (holding that "for a prosecutor's closing argument to be improper, he must explicitly state that he is asserting his personal views" (emphasis in original)).

### D. Defendant's Claim That the Trial Court Erred by Failing To Inquire Into His Posttrial Allegations of Ineffective Assistance of Counsel

Defendant next argues that the trial court erred by failing to conduct an inquiry into his posttrial claims of ineffective assistance of trial counsel.  We disagree.

### 1. Background

After defendant was convicted but before sentencing, he sent a letter to the trial court that stated in pertinent part as follows:

"I'm writing you asking you to point
[sic] me a new public defendar [sic] to hear
my postrial [sic] motions.  I wrote out the
postrial [sic] motions myself because its

- 29 -

been allmost [sic] 30 days and I haven't heard from or seen my [trial counsel]. I feel that he did not reprasent [sic] good as he could, and that I did not want to go to trial with him. In trial there were numerous amount [sic] of errors and I pray that you grant me a new trial with another counsal [sic]. I'm asking that you take my motions into consideration."

Defendant also filed six pro se posttrial motions of a similar bent. For instance, he complained that (1) his lawyer filed no motions; (2) witnesses were not sure about their identification; (3) he "did not have a trial of [his] pears [sic]"; (4) "there was bad investigation in my case"; (5) nothing was shown in court that physically linked him to the scene of the crime; (6) the jury was racist; and so on. Defendant's trial counsel also filed a motion for a new trial.

In October 2004, the trial court denied the motion filed by defense counsel. The court also referred to some of defendant's pro se motions and denied them. Before doing so, the court did not inquire into any of defendant's pro se posttrial claims.

### 2. Analysis

In People v. Moore, 207 Ill. 2d 68, 77-78, 797 N.E.2d

631, 637 (2003), the supreme court explained when a trial court
needs to conduct an inquiry after a defendant presents a <u>pro</u>
<u>se</u> posttrial motion alleging ineffective assistance of counsel
and wrote as follows:

> "New counsel is not automatically required in
> every case in which a defendant presents a
> <u>pro</u> <u>se</u> posttrial motion alleging ineffective
> assistance of counsel.  Rather, when a defen-
> dant presents a <u>pro</u> <u>se</u> posttrial claim of
> ineffective assistance of counsel, the trial
> court should first examine the factual basis
> of the defendant's claim.  If the trial court
> determines that the claim lacks merit or
> pertains only to matters of trial strategy,
> then the court need not appoint new counsel
> and may deny the <u>pro</u> <u>se</u> motion.  However, if
> the allegations show possible neglect of the
> case, new counsel should be appointed."

In addition, the <u>Moore</u> court explained that "the trial court can
base its evaluation of the defendant's <u>pro</u> <u>se</u> allegations of
ineffective assistance on its knowledge of defense counsel's
performance at trial and <u>the</u> <u>insufficiency</u> <u>of</u> <u>the</u> <u>defendant's</u>
<u>allegations</u> <u>on</u> <u>their</u> <u>face</u>."  (Emphasis added.)  <u>Moore</u>, 207 Ill.
2d at 79, 797 N.E.2d at 638.

Judged in accordance with the foregoing standards, we conclude that the trial court did not err by failing to conduct an inquiry into defendant's pro se posttrial complaints. We view defendant's rambling pro se motions and his letter as a reflection of the unhappy position in which he found himself, not as any serious statement of "possible neglect of the case" by defendant's trial counsel. Moore, 207 Ill. 2d at 78, 797 N.E.2d at 637. In this regard, we agree with the observation made by the First District in People v. Ward, 371 Ill. App. 3d 382, 431, 862 N.E.2d 1102, 1147 (2007), where, in rejecting the same argument that defendant raises here, the court discussed Moore and noted that "there are still minimum requirements a defendant must meet in order to trigger a preliminary inquiry by the circuit court." See also People v. Ford, 368 Ill. App. 3d 271, 276, 857 N.E.2d 871, 876 (2006) (no posttrial inquiry by the trial court was necessary where defendant's pro se complaints about his trial counsel were facially insufficient and set forth in a general and conclusory manner).

### E. Defendant's Claim that the Trial Court Erred When it Determined that His Conduct Caused Severe Bodily Injury

Defendant next argues that the trial court erred when it determined that his conduct caused severe bodily injury. We disagree.

Section 5-8-4(a)(i) of the Unified Code of Corrections (730 ILCS 5/5-8-4(a)(i) (West 2004)) requires the trial court to

- 32 -

impose consecutive sentences if "one of the offenses for which defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury." Defendant was convicted of two Class X felonies (armed robbery and home invasion) and a Class 1 felony (aggravated discharge of a firearm).

At defendant's December 2004 sentencing hearing, the State argued that the trial court was required to impose consecutive sentences because defendant inflicted "severe bodily injury" on Griffitts within the meaning of section 5-8-4(a)(i) of the Unified Code. The trial court agreed with the State and explained its decision as follows:

> "[T]he threshold question is *** did this [d]efendant cause great bodily harm or severe bodily harm to the victim. I think taking the totality of the circumstances into account and also the case law I have read, *** I believe the injuries do constitute great bodily harm and severe bodily harm, so I'm going to make that finding here.
>
> We have a victim who was pistol-whipped, and as a result of that had to have *** at least seven staples placed in his head in order to treat the injury.

In addition to that, after the pistol-whipping, this [d]efendant did kick the victim in the face causing bruises, hematomas, causing an additional cut to the lip which required more stitches.

So I think there [are] ample grounds *** to make a finding that I'm making here today of great bodily harm and severe bodily harm, and so I'm going to make that finding.

Having done that, the sentencing in this case actually becomes fairly simple, because I'm going to sentence the [d]efendant to the minimum terms that are available to me based on that finding, which even with the minimum are very severe in this case."

Defendant asserts that the appropriate standard of review for the trial court's determination that defendant inflicted severe bodily injury is de novo, but we disagree. Because the court's determination relied on a factual finding, this court will defer to the court's decision unless we conclude that it was against the manifest weight of the evidence. See In re Katrina R., 364 Ill. App. 3d 834, 842, 847 N.E.2d 586, 593 (2006) (deferring to the trial court's factual findings and noting that such findings are against the manifest weight of the

evidence only when the opposite conclusion is clearly evident or the findings are unreasonable, arbitrary, and not based on the evidence presented).

Judged in accordance with the foregoing standards, we conclude that the trial court's finding of severe bodily injury was not against the manifest weight of the evidence.

F. Defendant's Claim That the Trial Court Erred by Ordering That the Truth-In-Sentencing Statute Applies to All Three Sentences

Last, defendant argues that the trial court erred by applying section 3-6-3(a)(2)(iii) of the Unified Code (730 ILCS 5/3-6-3(a)(2)(iii) (West 2004)) to all three of his sentences.

Section 3-6-3(a)(2)(iii) of the Unified Code provides as follows:

"a prisoner serving a sentence for home invasion, armed robbery, aggravated vehicular hijacking, aggravated discharge of a firearm, *** when the court has made and entered a finding, pursuant to subsection (c-1) of [s]ection 5-4-1 of this [Unified] Code, that the conduct leading to conviction for the enumerated offense resulted in great bodily harm to a victim, shall receive no more than 4.5 days of good[-]conduct credit for each month of his or her sentence of imprison-ment." (Emphasis added.) 730 ILCS 5/3-6-

- 35 -

3(a)(2)(iii) (West 2004).

At defendant's sentencing hearing, the State asked the trial court to make a "great[-]bodily[-]harm finding" so that the provisions of section 3-6-3(a)(2)(iii) of the Unified Code would apply, requiring defendant to serve 85% of whatever sentence the court imposed. The court heard arguments from counsel on this point, ultimately granted the State's request, and made the great-bodily-harm finding, as earlier quoted.

Defendant specifically contends that the trial court erred by finding that the conduct leading to the conviction for all three crimes resulted in great bodily harm to the victim. According to defendant, however, the evidence at trial clearly showed "that great bodily harm cannot have occurred during the commission of all three crimes, but instead only during the commission of the armed robbery." The State responds that defendant has forfeited this argument on appeal by failing to raise it in the trial court, and we agree.

In People v. Rathbone, 345 Ill. App. 3d 305, 308-10, 802 N.E.2d 333, 336-37 (2003), this court deemed a defendant's sentencing argument on appeal forfeited, pointing out that section 5-8-1(c) of the Unified Code required a defendant's challenge to any aspect of sentencing to be made by a written motion filed within 30 days of the imposition of sentence. 730 ILCS 5/5-8-1(c) (West 2004). We also noted that the Supreme

Court of Illinois, in People v. Reed, 177 Ill. 2d 389, 394, 686 N.E.2d 584, 586 (1997), held that the language of section 5-8-1(c) is mandatory. Citing section 5-8-1(c) and Reed, this court concluded in Rathbone that the defendant had forfeited the sentencing argument he raised on appeal, and we explained as follows:

> "In so concluding, we note that defendant's claim is precisely the type of claim the forfeiture rule is intended to bar from review when not first considered by the trial court. Had defendant raised this issue in the trial court, that court could have answered the claim by either (1) acknowledging its mistake and correcting the sentence, or (2) explaining that the court did not improperly sentence defendant ***. If the court did not change the sentence, then a record would have been made on the matter now before us, avoiding the need for this court to speculate as to the basis for the trial court's sentence." Rathbone, 345 Ill. App. 3d at 310, 802 N.E.2d at 337.

The rationale and holding of Rathbone are equally applicable in this case. Defendant's failure to raise this issue

in the trial court was in violation of section 5-8-1(c) of the Unified Code and denied that court the opportunity to correct or clarify its ruling. Accordingly, defendant has forfeited his truth-in-sentencing argument.

On a final note, we rejected the defendant's request in Rathbone to apply the plain-error doctrine, and we do likewise here. In People v. Allen, 222 Ill. 2d 340, 353, 856 N.E.2d 349, 356 (2006), the supreme court explained as follows: "[t]he plain-error doctrine is not '"a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court."' [Citations.] Instead, it is a narrow and limited exception to the general rule of forfeiture." Further, as we noted in Rathbone,

"our supreme court has 'consistently empha-
sized the limited nature of the plain[-]error
exception.' People v. Easley, 148 Ill. 2d
281, 337, 592 N.E.2d 1036, 1061 (1992).
Plain error exists only when the essential
fairness of a trial has been undermined, and
this 'occurs only in situations which "reveal
breakdowns in the adversary system," as dis-
tinguished from "typical trial mistakes."'
People v. Keene, 169 Ill. 2d 1, 17, 660
N.E.2d 901, 909-10 (1995), quoting P.

Wangerin, 'Plain Error' and 'Fundamental Fairness'; Toward Definition of Exceptions to the Rules of Procedural Default, 29 DePaul L. Rev. 753, 778 (1980)." Rathbone, 345 Ill. App. 3d at 311, 802 N.E.2d at 338-39.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.  As part of our judgment, we grant the State its statutory assessment of $50 against defendant as costs of this appeal.

Affirmed.

APPLETON and McCULLOUGH, JJ., concur.